*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0239P (6th Cir.)
File Name: 04a0239p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

No. 03-1489

JOHN A. RAPANOS; JUDITH A.
NELKIE RAPANOS; PRODO,
INC.; ROLLING MEADOWS
HUNT CLUB; PINE RIVER
BLUFF ESTATES, INC.,
*Defendants-Appellants.*

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 94-70788—Bernard A. Friedman, Chief District Judge.

Argued: June 9, 2004

Decided and Filed: July 26, 2004

Before: SILER and GIBBONS, Circuit Judges; REEVES,
District Judge.[*]

---

[*] The Honorable Danny C. Reeves, United States District Judge for
the Eastern District of Kentucky, sitting by designation.

---

### COUNSEL

**ARGUED:** David E. Dearing, Indianapolis, Indiana, for
Appellants. Katherine W. Hazard, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellee. **ON BRIEF:** David E. Dearing, Indianapolis,
Indiana, for Appellants. Katherine W. Hazard, UNITED
STATES DEPARTMENT OF JUSTICE, Washington, D.C.,
for Appellee.

---

### OPINION

---

DANNY C. REEVES, District Judge. Plaintiff-Appellee
United States brought suit against the Defendants pursuant to
the Federal Water Pollution Control Act Amendments of
1972, Pub. L. No. 92-500, 86 Stat. 817, as amended 33 U.S.C.
§ 1251 *et seq*., commonly known as the Clean Water Act
("CWA"). Defendants-Appellants John Rapanos, Judith
Rapanos, Prodo, Inc., Rolling Meadows Hunt Club, and Pine
River Bluff Estates, Inc. appeal the district court's entry of
judgment in favor of the United States. Prodo, Inc., Rolling
Meadows Hunt Club, and Pine River Bluff Estates, Inc. are
wholly owned by John and Judith Rapanos. For the reasons
discussed below, we **AFFIRM** the judgment of the district
court.

### BACKGROUND

The Rapanos, through their wholly-owned companies,
owned various parcels of land in Bay, Midland, and Saginaw
Counties in Michigan. These parcels are known as the
Salzburg, Hines Road, Pine River, Freeland, Mapleton, and
Jefferson Avenue sites. The Rapanos were charged with
illegally discharging fill material into protected wetlands at

these sites between 1988 and 1997. The United States alleges that the Rapanos attempted to fill these wetlands to make the land more conducive to development.

## I. The Salzburg Site

Before filling wetlands subject to CWA jurisdiction, a landowner must first obtain a permit from the Army Corps of Engineers ("Corps"). 33 U.S.C. § 1344. In December 1988, John Rapanos asked the state to inspect the Salzburg site in hope of obtaining a permit to construct a shopping center at this location. The state informed him that the site was likely a regulated wetland and sent him an application for the necessary permits. A state representative toured the site in March 1989, noting that the site probably contained wetlands but could be developed if the necessary permits were issued. Mr. Rapanos hired a consultant, Dr. Goff, to prepare a report detailing the wetlands on the Salzburg site. Dr. Goff concluded that there were between 48 and 58 acres of wetlands on the site, presenting his findings in the form of a report and a map. Upset by the report, Mr. Rapanos ordered Dr. Goff to destroy both the report and map, as well as all references to Mr. Rapanos in Dr. Goff's files. However, Dr. Goff was unwilling to do so. Mr. Rapanos stated he would "destroy" Dr. Goff if he did not comply, claiming that he would do away with the report and bulldoze the site himself, regardless of Dr. Goff's findings.

In April 1989, workers began leveling the ground, filling in low spots, clearing brush, removing stumps, moving dirt, and dumping sand to cover most of the wetland vegetation. This activity caused Dr. Goff to note that the site now looked "like nothing more than a beach." In August 1989 the state attempted to inspect the Salzburg site, but was denied access. Three months later, authorities from the state returned, armed with a search warrant.

In 1991, a state representative returned to the Salzburg site, noting that the site had been "tiled" to drain subsurface water.

When Mr. Rapanos refused to comply with an administrative compliance order issued by the Environmental Protection Agency ("EPA") (requiring him to immediately cease his filling of the Salzburg site), the EPA referred the matter to the Department of Justice.

## II. The Hines Road Site

The Defendants undertook to expand drains, build roads, and fill the wetlands at the Hines Road site. However, in July 1992, the state issued a cease and desist letter to stop the ongoing activity. Mr. Rapanos did not reply to this letter. Thereafter, the state conducted an examination of the site pursuant to a search warrant in June 1994. In June 1997, the state returned to the site and noted that fill had been added to certain areas since the 1994 search. Accordingly, the EPA issued an administrative compliance order. The EPA alleges that Mr. Rapanos did not comply with this order.

## III. The Pine River Site

Mr. Rapanos also hired contractors at the Pine River site to construct ditches, spread dirt and sand, construct roads, and clear vegetation. The state sent Mr. Rapanos a cease and desist order after an official observed that portions of the wetlands had been filled. The EPA issued an administrative compliance order in September 1997 after Mr. Rapanos refused to comply with the cease and desist order. The EPA alleges that Mr. Rapanos also did not comply with the administrative order.

## IV. The Criminal Proceedings

Criminal charges were brought simultaneously with the instant civil action. In July 1994, the district court declared a mistrial in Mr. Rapanos' criminal trial. The trial was moved to Flint, Michigan and, on March 7, 1995, the jury in the second trial returned a guilty verdict on two counts. *United States v. Rapanos*, 895 F.Supp. 165, 166 (E.D. Mich. 1995).

Following trial, the district court granted Rapanos' motion for a new trial, finding that the court had improperly allowed the United States to pursue a line of questioning that was prejudicial to the defendant. *Id*. at 169-70. This court, however, determined that the line of questioning was not improper and reversed the district court's grant of a new trial and remanded for sentencing. *United States v. Rapanos*, 115 F.3d 367, 374 (6th Cir. 1997). The district court sentenced Rapanos to three years probation and ordered him to pay a $185,000 fine. On appeal, this court affirmed the conviction but remanded for resentencing. *United States v. Rapanos*, 235 F.3d 256, 261 (6th Cir. 2000).

The Supreme Court granted Rapanos' request for a writ of certiorari, vacating and remanding this court's order in light of *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"). *Rapanos v. United States*, 533 U.S. 913 (2001). Following remand from the Supreme Court, this court remanded the case to the district court for further consideration. *United States v. Rapanos*, Nos. 98-2424, 99-1578, 99-1074, 16 Fed. Appx. 345 (6th Cir. 2001). On remand, the district court set aside the conviction, finding that the United States lacked jurisdiction in the wake of the Supreme Court's ruling in *SWANCC. United States. v. Rapanos*, 190 F.Supp. 2d 1011 (E.D. Mich. 2002). On appeal, this court reversed the order of the district court, reinstated the previous conviction and remanded to the district court for resentencing. *United States v. Rapanos*, 339 F.3d 447, 454 (6th Cir. 2003). A panel of this court determined that, despite the Supreme Court's decision in *SWANCC*, the United States retained jurisdiction over the wetlands at issue by virtue of the CWA.[1] Recently, the Supreme Court denied

Rapanos' petition for a writ of certiorari. *Rapanos v. United States*, 124 S. Ct. 1875 (2004).

## V. The Civil Proceedings

The United States initiated this civil action in February 1994, confining its scope to the Salzburg site and naming only Mr. Rapanos as a defendant. In June 1996, the United States added Mrs. Rapanos to the complaint, as well as Prodo, Inc., a company owned by Mr. Rapanos. In February 1998, the United States amended its complaint to add allegations concerning the Hines Road and Pine River sites. Pine River Bluffs Estates was also added as a defendant.

Following a 13-day bench trial, the district court concluded that Rapanos had filled 22 of 28 acres of protected wetlands at the Salzburg site, 17 of 64 acres of protected wetlands at the Hines Road site, and 15 of 49 acres of protected wetlands at the Pine River site. The district court concluded that the government had established that 54 of the filled acres fit the three parameters for wetlands, *i.e.*, vegetation, soils, and hydrology. In addition, the court found that the United States did not meet its burden regarding the existence of wetlands at the Freeland and Mapleton sites. The district court entered these findings and conclusions on March 22, 2000.[2]

## STANDARD OF REVIEW

Following a bench trial, this court reviews the district court's findings of fact for clear error and reviews its conclusions of law *de novo*. *Pledger v. United States*, 236 F.3d 315, 320 (6th Cir. 2000). Factual determinations of a trial court are not clearly erroneous unless we are "left with the definite and firm conviction that a mistake has been

---

[1]The land at issue in the criminal trial was the Salzburg site. The Salzburg site in the criminal trial is somewhat different than the Salzburg site involved in this proceeding.

[2]On January 10, 2003, after the Supreme Court overturned the "Migratory Bird Rule" as an excessive extension of jurisdiction under the CWA in *SWANCC*, the district court amended its findings to remove all references to the "Migratory Bird Rule" as a basis for federal jurisdiction.

committed." *Id*. (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 573-74.

## DISCUSSION

On appeal, Rapanos argues that the district court erred when it (1) held that the disturbed wetlands were adjacent wetlands because they had a surface connection to waters of the United States; (2) failed to make subsidiary findings to support its conclusion that the Salzburg, Hines Road, and Pine River sites had a hydrological connection to navigable waters; (3) allowed plaintiff's expert Dr. Willard to testify; (4) failed to consider Michigan's definition of "wetland"; (5) collaterally estopped Rapanos from denying liability at the Salzburg site; and (6) relied on Dr. Willard's testimony to determine the extent of unauthorized filling.

## I. The CWA

In 1972, Congress reacted to the problem of water pollution by enacting the CWA. The CWA is viewed by some as the federal government's main weapon in its effort to protect wetlands. David Dornak, *A New Generation is Teeing Off: Is Tiger Woods Making Divots on Environmentally Sound Golf Courses?*, 23 Colum. J. Envtl. L. 299, 324 (1998). Section 404 of the CWA requires landowners to obtain permits from the Army Corps of Engineers ("Corps") before discharging fill material into wetlands adjacent to navigable bodies of water and their tributaries. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 123 (1985); *see also* 33 U.S.C. § 1344.

"Navigable waters" are defined as "waters of the United States, including territorial seas." 33 U.S.C.§ 1362(7). The

Supreme Court and this court have noted that "Congress chose to define waters covered by the Act broadly" in the CWA. *Riverside Bayview*, 474 U.S. at 133; *Rapanos*, 339 F.3d at 450-51. Determining the precise boundary of which waters are covered by the CWA has been difficult. It is well-settled that the CWA covers more than what has come to be known as "navigable in fact waters," *i.e.*, waters that can be navigated in the traditional sense. *See id*. at 451. As the Supreme Court has noted, CWA jurisdiction extends beyond traditionally navigable waters because economic activities affecting interstate commerce are susceptible to "congressional regulation under the Commerce Clause irrespective of whether navigation, or, indeed, water, is involved." *Kaiser Aetna v. United States*, 444 U.S. 164, 174 (1979).

The CWA's broad reach, extending beyond traditionally navigable waters, however, does not extend to all waters. The Code of Federal Regulations contains the Corps' interpretation of which waters are properly considered "waters of the United States." 33 C.F.R. § 328.3. In the present case, the district court relied on the Corps' exercise of jurisdiction over "wetlands adjacent to traditional navigable waters" as supporting CWA jurisdiction for the Defendants' lands. *Id*. at § 328.3(a)(7). It found that the wetlands were adjacent to tributaries of traditional navigable waters. The Corps asserts jurisdiction over such waters pursuant to the CWA. *Id*. at §§ 328.3(a)(5), 328.3(a)(7).

Determining which wetlands are considered "adjacent to" traditional navigable waters or their tributaries has proved to be a complication in defining CWA jurisdiction. The Code of Federal Regulations states that "adjacent" means "bordering, contiguous, or neighboring. Wetlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" 33 C.F.R. § 328.3(c).

In order to invoke federal jurisdiction the wetlands must bear some connection to navigable waters or interstate commerce. Determining how much of a connection is necessary has proven difficult. Unfortunately, the two leading Supreme Court cases on the reach of the CWA have done little to clear the muddied waters of CWA jurisdiction.

### A. *Riverside Bayview*

Riverside Bayview Homes owned 80 acres of low-lying, marshy land near the shores of Lake St. Clair in Macomb County, Michigan. It began filling part of the land with the intention of constructing a housing development on the site. The Corps determined that the land was an "adjacent wetland," thus falling under the ambit of the CWA. The district court determined that the land on the site below 575.5 feet above sea level was a wetland requiring the issuance of a permit before it could be filled. *Riverside Bayview*, 474 U.S. at 125. This court reversed the district court, concluding that adjacent wetlands only existed when the land was flooded by adjacent navigable waters at a frequency sufficient to support the growth of aquatic vegetation. *United States v. Riverside Bayview Homes, Inc.*, 729 F.2d 391 (6th Cir. 1984).

This court was largely motivated by Fifth Amendment takings concerns, concluding that the CWA must be read narrowly to avoid improper condemnation by the government. A unanimous Supreme Court, however, held that the Tucker Act, 28 U.S.C. § 1491, provides the owners of condemned land with the right of compensation and thus concluded that this court was not justified in reading the CWA's jurisdiction so narrowly. *Riverside Bayview*, 474 U.S. at 128. Having disposed of the Fifth Amendment issue, the Court concluded that "[t]he plain language of [33 C.F.R. § 323.2(c)] refutes the Court of Appeals' conclusion that inundation or 'frequent flooding' by the adjacent body of water is a *sine qua non* of a wetland under the regulation." *Id*. at 129.

Next, the Court addressed the issue of which waters could be considered "adjacent to navigable waters."

In determining the limits of its power to regulate discharges under the Act, the Corps must necessarily choose some point at which water ends and land begins. Our common experience tells us that this is often no easy task: the transition from water to solid ground is not necessarily or even typically an abrupt one. Rather, between open waters and dry land may lie shallows, marshes, mudflats, swamps, bogs -- in short, a huge array of areas that are not wholly aquatic but nevertheless fall far short of being dry land. Where on this continuum to find the limit of "waters" is far from obvious.

*Id*. at 132.

The Court concluded that to protect against pollution "at its source," Congress sought to define coverage of the CWA broadly. *Id*. at 133. It noted that even wetlands that are not connected to adjacent bodies of water and are not regularly inundated by flooding may still have a connection to navigable waters because such water can drain into navigable waters. *Id*. at 134. These adjacent bodies of water can bring pollution to the navigable waters, resulting in possibly disastrous effects on the habitat and food chain for the native aquatic species. *See id.* at 134-35. Thus, the Court wrote that

the Corps has concluded that wetlands adjacent to lakes, rivers, streams, and other bodies of water may function as integral parts of the aquatic environment even when the moisture creating the wetlands does not find its source in the adjacent bodies of water. . . . [W]e cannot say that the Corps' judgment on these matters is unreasonable, and we therefore conclude that a definition of "waters of the United States" encompassing all wetlands adjacent to other bodies of water over which the Corps has jurisdiction is a permissible interpretation of the [CWA].

*Id*. at 135.

B. *SWANCC*

After upholding a broad view of the CWA's jurisdictional reach in *Riverside Bayview*, a divided Supreme Court invalidated one of the Corps' jurisdictional regulations in *SWANCC*. The regulation at issue, known as "the Migratory Bird Rule," extended the definition of "waters of the United States" to include isolated waters that were used as habitat by migratory birds or endangered species. Final Rule for Regulatory Programs of the Corps of Engineers, 51 Fed. Reg. 41206, 41217 (Nov. 13, 1986) (previously codified at 33 C.F.R. § 328.3). The disputed land was a 533 acre parcel straddling the Cook and Kane County lines in northern Illinois. The land was owned by the Solid Waste Agency of Northern Cook County, a consortium of 23 Chicago cities that sought to develop a garbage disposal site. *SWANCC*, 531 U.S. at 162-63. The Corps initially determined that it had no jurisdiction over the land because it did not contain any wetlands and did not support "vegetation typically adapted for life in saturated soil conditions." *Id*. at 164 (citing 33 C.F.R. § 328.3(b)). However, after learning that several migratory birds were observed at the site, the Corps asserted jurisdiction under the Migratory Bird Rule. *Id*.

The Seventh Circuit concluded that the federal government had the authority to use the Migratory Bird Rule, relying on the cumulative impact doctrine to conclude that, *in toto*, the impact on migratory birds from disturbing wholly intrastate, non-navigable waters had a substantial impact on interstate commerce. *Solid Waste Agency of N. Cook County v. United States Army Corps of Engineers*, 191 F.3d 845, 850 (7th Cir. 1999). A majority of the Supreme Court disagreed, however, holding that the Migratory Bird Rule was not supported by Congress' intent in passing the CWA and thus concluding that it was unnecessary to determine whether the Migratory Bird Rule fell within the broadest reach of Congress' commerce powers. *SWANCC*, 531 U.S. at 167.

In doing so, the Court first reaffirmed the holding in *Riverside Bayview*, pointing out that in *Riverside Bayview*

we noted that the term "navigable" is of "limited import" and that Congress evidenced its intent to regulate at least some waters that would not be deemed "navigable" under the classical understanding of that term. But our holding was based in large measure upon Congress' unequivocal acquiescence to, and approval of, the Corps' regulations interpreting the CWA to cover wetlands adjacent to navigable waters. We found that Congress' concern for the protection of water quality and aquatic ecosystems indicated its intent to regulate wetlands inseparably bound up with the "waters" of the United States.

It was the significant nexus between the wetlands and "navigable waters" that informed our reading of the CWA in *Riverside Bayview Homes*. Indeed, we did not express any opinion on the question of the authority of the Corps to regulate discharges of fill material into wetlands that are not adjacent to open bodies of water. In order to rule for respondents here, we would have to hold that the jurisdiction of the Corps extends to ponds that are *not* adjacent to open water. But we conclude that the test of the statute will not allow this.

*SWANCC*, 531 U.S. at 167-68 (citations omitted) (emphasis in original).

The Court also refused to extend *Chevron* deference to the Corps' interpretation of its authority under the CWA. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). It reasoned that such deference was inappropriate where the Corps was infringing upon a power usually reserved to the states, *i.e.*, the authority to regulate land and water use. *SWANCC*, 531 U.S. at 172-74. Therefore, the Court concluded that Congress had not envisioned extending CWA jurisdiction to isolated, intrastate, non-navigable "ponds" simply by virtue of the fact that they

were occasionally the home for migratory birds, despite the Corps' contrary interpretation of its authority. *Id*. at 171-72.

## C. *Putting Riverside Bayview and SWANCC in Context*

The Court in *SWANCC* noted that even reading the CWA through a *restrictive* lens demonstrates that Congress "wanted to include all waters adjacent to 'navigable waters,' such as nonnavigable tributaries and streams" in its definition of "waters of the United States." *SWANCC*, 531 U.S. at 171. Lower courts have disagreed over the extent to which *SWANCC* limited *Riverside Bayview*'s holding. *SWANCC* only specifically addressed the Migratory Bird Rule, and in fact specifically held that it was not overruling any aspect of *Riverside Bayview*, yet its language has been seen by some as justification for a wide-ranging reduction of the CWA's jurisdiction. A minority of courts have done so, reading *SWANCC* broadly to limit the CWA to navigable waters and non-navigable waters that directly abut navigable waters. *In re Needham*, 354 F.3d 340, 345-46 (5th Cir. 2003); *FD & P Enterprises, Inc. v. U.S. Army Corps of Engineers*, 239 F.Supp.2d 509, 516 (D.N.J. 2003). Conversely, the majority of courts have interpreted *SWANCC* narrowly to hold that while the CWA does not reach isolated waters having no connection with navigable waters, it does reach inland waters that share a hydrological connection with navigable waters. *Rapanos*, 339 F.3d at 453; *Treacy v. Newdunn Assoc., LLP*, 344 F.3d 407, 415 (4th Cir. 2003); *United States v. Deaton*, 332 F.3d 698, 702 (4th Cir. 2003), *cert. denied*, 124 S.Ct. 1874 (2004); *United States v. Rueth Dev. Co.*, 335 F.3d 598, 604 (7th Cir. 2003), *cert. denied*, 124 S.Ct. 835 (2003); *Headwaters v. Talent Irrigation District*, 243 F.3d 526, 533-34 (9th Cir. 2001); *Carabell v. United States Army Corps of Engineers*, 257 F. Supp. 2d 917, 930 (E.D. Mich. 2003); *United States v. Interstate Gen. Co.*, 152 F. Supp. 2d 843, 847 (D. Md. 2001).

The Fifth Circuit has adopted the more expansive reading of *SWANCC* and thus the more limited interpretation of the

CWA's jurisdiction. *Needham*, 354 F.3d at 345-46. The *Needham* court disagreed that water exhibiting a hydrological connection with "navigable water" should be considered part of the "waters of the United States," instead finding that the water must be "truly adjacent to navigable waters," or at least have a "significant measure of proximity" to navigable waters. *Id*. at 345, 347, n.12. In reaching this conclusion, the Fifth Circuit relied heavily on *SWANCC*, disagreeing with holdings from the Fourth, Seventh, and Ninth Circuits, as well as this court, that have adopted a limited interpretation of *SWANCC*. *Rapanos*, 339 F.3d at 453 (finding that the *SWANCC* court merely invalidated the Migratory Bird Rule and did not deal with the Corps' "adjacent waters" jurisdiction); *Treacy*, 344 F.3d at 415 (noting that *SWANCC* reaffirmed the holding in *Riverside Bayview* and did not abridge the Corps' authority over "adjacent waters"); *Deaton*, 332 F.3d at 702 (holding that *SWANCC* did not disavow any of the Corps' interpretations of the CWA, save for the Migratory Bird Rule); *Rueth Dev. Co.*, 335 F.3d at 604 ("it is clear that *SWANCC* did not affect the law regarding the government's alternative asserted basis for jurisdiction adjacency under [the "adjacent water" rule]. The Corps' adjacency jurisdiction is well-established; it was upheld by the Supreme Court in [*Riverside Bayview*], and was reaffirmed in *SWANCC*"); *Headwaters*, 243 F.3d at 533-34 (holding that *SWANCC* did not impact its conclusion that waters flowing into navigable waters are within the CWA's jurisdiction); *Carabell*, 257 F. Supp. 2d at 930 (concluding that *SWANCC*'s holding was narrow and did not require a body of water to directly abut navigable water in order to fall under the jurisdiction of the CWA); *Interstate Gen. Co.*, 152 F. Supp. 2d at 847 ("[b]ecause the Supreme Court only reviewed 33 CFR § 328.3(a)(3), it would be improper for this Court to extend the *SWANCC* Court's ruling any further than they clearly intended"); *but see FD & P Enterprises*, 239 F. Supp. 2d at 516 ("it is the view of this court that the 'hydrological connection' test is no longer the valid mode of analysis").

In Rapanos' criminal trial, a panel of this court adopted the limited reading of *SWANCC* criticized in *Needham*. Adopting the Fourth Circuit's reasoning in *Deaton*, this court held that

because we find the Fourth Circuit's reasoning persuasive, we disagree with the broad interpretation of [*SWANCC*] taken by the district court in this case and, instead, agree with *Deaton*. Although the [*SWANCC*] opinion limits the application of the Clean Water Act, the Court did not go as far as Rapanos argues, restricting the Act's coverage to only wetlands directly abutting navigable water. Instead, the [*SWANCC*] Court, in a narrow holding, invalidated the Migratory Bird Rule as exceeding the authority granted to the [Corps] by the [CWA], because it found "nothing approaching a clear statement from Congress that it intended [the CWA] to reach an abandoned sand and gravel pit."

*Rapanos*, 339 F.3d at 453 (citations omitted). This court further adopted the holding in *Deaton*, that "adjacent waterways" include any branch of a tributary system that eventually flows into a navigable body of water. *Rapanos*, 339 F.3d at 452-53. This court concluded that the wetlands were adjacent because "[a]ny contamination of the Rapanos wetlands could affect the Drain, which, in turn could affect navigable-in-fact waters." *Id*.

Thus, the primary difference between the conclusion reached by the Fifth Circuit and that reached by the Fourth, Sixth, Seventh, and Ninth Circuits, concerns the "adjacency" requirement. The Fifth Circuit requires that the non-navigable water be "truly adjacent to navigable waters" in order to qualify for CWA jurisdiction. The majority of courts, including this one, however, construe *Riverside Bayview* and *SWANCC* to hold that, while a hydrological connection between the non-navigable and navigable waters is required, there is no "direct abutment" requirement.

What is required for CWA jurisdiction over "adjacent waters," however, is a "significant nexus between the wetlands and 'navigable waters,'" *SWANCC*, 531 U.S. at 167, which can be satisfied by the presence of a hydrological connection. *Rapanos*, 339 F.3d at 453; *see also Deaton*, 332 F.3d at 711-12 (CWA jurisdiction extends to those waters adjacent to any branch of a tributary system that eventually flows into a navigable water, because these waters effect the water quality of navigable waters and thus there is a "substantial nexus" between the tributaries and the navigable waters); *Headwaters*, 243 F.3d at 533 ("Because the canals receive water from natural streams and lakes, and divert water to streams and creeks, they are connected as tributaries to other 'waters of the United States'"). Waters sharing a hydrological connection are interconnected, sharing a symbiotic relationship. As Congress acknowledged when passing the CWA, "[w]ater moves in hydrological cycles and it is essential that discharge of pollutants be controlled at the source." *Rapanos*, 339 F.3d at 451 (citing S.Rep. No. 92-414, at 77 (1972), *reprinted in* 1972 U.S.C.C.A.N. 3668, 3742).

Unlike the absence of Congressional support for the Migratory Bird Rule discussed in *SWANCC*, Congress clearly envisioned that CWA jurisdiction would extend to bodies of water exhibiting a hydrological connection to traditional navigable waters. As this court previously recognized

[i]n *Riverside Bayview* the Supreme Court concluded that the Corps regulation extending jurisdiction to adjacent wetlands was a reasonable interpretation in part because of what [*SWANCC*] described as "the significant nexus between the wetlands and 'navigable waters.'" There is also a nexus between a navigable waterway and its nonnavigable tributaries. . . . This nexus, in light of the "breadth of congressional concern for protection of water quality and aquatic ecosystems," is sufficient to allow the Corps to determine reasonably that its jurisdiction over the whole tributary system of any navigable waterway is

warranted. The regulation, as the Corps reads it, reflects a reasonable interpretation of the Clean Water Act.

*Rapanos*, 339 F.3d at 452 (quoting *Deaton*, 332 F.3d at 712).

### D.   *Chevron Deference*

The doctrine of "administrative deference," also known as "*Chevron* deference," provides an alternative ground for affirming the Corps' authority over waters adjacent to tributaries of navigable waters.  When Congress delegates authority to enforce a statute to a governmental agency, while leaving some ambiguity in how the agency is to enforce the statute, courts should assume that Congress impliedly delegated the authority to interpret the ambiguity to the agency charged with administering the statute. *Chevron*, 467 U.S. at 843-45.  The agency is thus in the position to "fill the gaps" left by Congress.  Unless the agency's interpretation of the statute is "arbitrary, unreasonable, or manifestly contrary to the statute," the agency interpretation should be applied. *Id*. at 843-44.

In *Chevron*, a unanimous Supreme Court pointed out that deferring to agency interpretations, rather than requiring judicial interpretation, served the interests of democracy, noting that

> Judges are not experts in the field, and are not part of either political branch of the Government.  Courts must, in some cases, reconcile competing political interests, but not on the basis of the judges' personal policy preferences.  In contrast, an agency to which Congress has delegated policymaking responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices -- resolving the

> competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.
>
> When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.  In such a case, federal judges -- who have no constituency -- have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: Our Constitution vests such responsibilities in the political branches.

*Id*. at 865-66 (citation omitted).  Before according deference to agency interpretations, a federal court "need not find that [the agency's interpretation] is the only permissible construction . . . but only that [its] understanding of this . . . statute is a sufficiently rational one to preclude a court from substituting its judgment for that of [the agency.]" *Chem. Mfrs. Ass'n v. Natural Resources Defense Council*, 470 U.S. 116, 125 (1985) (citation omitted).  In *SWANCC* the Supreme Court refused to accord *Chevron* deference to the Corps' Migratory Bird Rule.  Noting that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress," the Court concluded that the Migratory Bird Rule infringed on the state's "traditional and primary power over land and water use," and thus was not entitled to *Chevron* deference.  *Id*. at 173-74 (citation omitted).  In *Riverside Bayview*, however, the Supreme Court accorded *Chevron* deference to the Corps' conclusion that "waters of the United States" included wetlands adjacent to navigable waters.  474 U.S. at 134-35.  As the *SWANCC*

Court recognized, deference was appropriate in *Riverside Bayview* given the significant nexus between the adjacent waters and navigable waters that was not present in the "nonnavigable, isolated, intrastate ponds" at issue in *SWANCC* whose only connection to interstate commerce was the fact that they were occasionally home to migratory birds.

In *Deaton*, after conducting a thorough review of the CWA, the Fourth Circuit accorded *Chevron* deference to the Corps' construction of the CWA that granted it authority over "distant, nonnavigable tributaries of navigable waters." *Deaton*, 332 F.3d at 709. In *Rapanos*, this court agreed with the Fourth Circuit's holding in *Deaton*. *Rapanos*, 339 F.3d at 452-53. Because waters containing a hydrological connection to tributaries of navigable waters bear a "significant nexus" to navigable waters, as in *Riverside Bayview* and unlike the waters in *SWANCC*, *Chevron* deference is appropriate. The Corps' interpretation of "waters of the United States" to include those waters adjacent to tributaries of navigable waters, that share a hydrological connection with those tributaries, is neither "arbitrary, unreasonable, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 843-44.

E.   *Application to this Case*

The Defendants argue that this court should impose a "direct abutment" requirement to CWA jurisdiction over non-navigable water. In response, the United States asserts that the Defendants waived a defense based on *SWANCC* by not raising it before the district court. It claims that, while the Defendants argued that the CWA does not extend to "isolated waters," they did not make the current argument that the CWA does not extend to "wetlands adjacent to nonnavigable tributaries." However, the United States is splitting hairs, as this is simply part and parcel of the "isolated waters" argument the Defendants made before the district court. Alternatively, the Defendants' current claim falls under the exceptions to the traditional rule that appellate courts will not entertain arguments raised for the first time on appeal because

this argument involves a question of law and the factual record has been fully developed below. *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 244 (6th Cir. 1991).

As discussed *supra*, Rapanos' argument regarding *SWANCC* has previously been adjudicated by this court, in a published disposition, and its conclusion is entitled to *stare decisis*. *See Rapanos*, 339 F.3d at 453. Indeed, Rapanos acknowledged as much during oral arguments. Further, this court's reasoning in that case is supported by the majority of circuits, by the policy of deferring to agency interpretations, and by a careful examination of the relevant Supreme Court cases. There is no "direct abutment" requirement in order to invoke CWA jurisdiction. Non-navigable waters must have a hydrological connection or some other "significant nexus" to traditional navigable waters in order to invoke CWA jurisdiction. Unlike the isolated waters in *SWANCC*, these waters are interconnected with traditional navigable waters.

Next, the Defendants' argument that the district court did not find that there was a "significant nexus" between the wetlands and the navigable waters is similarly misplaced. The district court found that all three sites contained a hydrological connection to navigable waters and thus fell within the jurisdiction of the CWA. Specifically, the district court found that

> the Salzburg wetlands have a surface water connection to tributaries of the Kawkawlin River which, in turn, flows into the Saginaw River and ultimately into Lake Huron. Dr. Willard testified that the wetlands at the Salzburg site had a surface connection to the waters of the United States. In 1994, Hal Harrington verified that a surface water connection exists between the Salzburg site and Saginaw Bay.

Further, Hal Harrington, Chief of the Michigan Department of Environmental Quality's Great Lakes Submerged Lands Unit, testified that there was a surface water connection

between the Salzburg site and the Saginaw Bay. In 1994 he visited the site. During this visit, he observed carp spawning in a roadside stream on the north side of the property. He followed the flow of the water and "each road crossing with this surface water connection to Saginaw where it entered . . . the river entering Saginaw Bay north of the Bay City State Park [the Kawkawlin River]." An expert for Rapanos, Dr. Straw, testified that water left the site through the Hoppler Drain, which drains into the Hoppler Creek. This drain is immediately north of the Salzburg site.[3]

Regarding the Hines Road site, the district court noted that

Dr. Willard testified that the wetlands at the Hines Road site have a surface water connection to the Rose Drain which, in turn, has a surface water connection to the Tittabawassee River. Dr. Willard also described the nature of the surface water connection between the wetlands at Hines Road and the Rose Drain. In October 1994, Dodgers and Zbiciak . . . demonstrated that the interior wetlands have a hydrologic connection with the Rose Drain.

In addition, Mr. Zbiciak, a representative from the State of Michigan, testified that the wetlands drained into the Rose Drain, which runs along the western side of the site and flows down to the Tittabawassee River. A report by Charlie Dodgers, another representative of the State of Michigan, indicated that the site inspection revealed five locations where water moved into the Rose Drain, as he testified at trial. Rapanos claims that ditches he dug in 1992 were the only cause of a surface water connection to the Rose drain.

---

[3]In Rapanos' criminal case, this court held that the evidence demonstrated that "the wetlands on Rapanos's land are adjacent to the Labozinski Drain . . ." and noted that contamination of that drain "could affect navigable-in-fact waters." *Rapanos*, 339 F.3d at 453 (discussing a slightly different parcel of land). The Labozinski Drain discussed in the criminal case drains into the Hoppler Drain.

However, Charlie Dodgers testified that surface runoff occurred naturally "at least seasonally," and one of the United States' exhibits demonstrated surface connections to the Rose drain as early as 1975.

Regarding the Pine River site, the district court noted that "Dr. Willard testified that the wetlands at the Pine River site have a surface water connection to the Pine River, which flows into Lake Huron." The maps utilized by the United States showed that areas of wetlands on the site were in close proximity to the Pine River (although they did not delineate the specific paths these wetlands would have taken to drain into the river).

Although the Defendants claim that the evidence did not support these conclusions, the record demonstrates that there were hydrological connections between all three sites and corresponding adjacent tributaries of navigable waters. *See Rapanos*, 339 F.3d at 453 ("Because the wetlands are adjacent to the Drain and there exists a hydrological connection among the wetlands, the Drain, and the Kawkawlin River, we find an ample nexus to establish jurisdiction."). Moreover, the Defendants are certainly unable to show that the district court's conclusions were clearly erroneous. *Pledger*, 236 F.3d at 320. The district court was in a far superior position to judge the complicated facts of this case after presiding over the lengthy proceedings and the bench trial. Further,

[t]he rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge

that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much. As the Court has stated in a different context, the trial on the merits should be "the 'main event' . . . rather than a "tryout on the road.'" *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977). For these reasons, review of factual findings under the clearly-erroneous standard -- with its deference to the trier of fact -- is the rule, not the exception.

*Anderson*, 470 U.S. at 574-75. The testimony and evidence in the record support the district court's findings. Its conclusions of fact are entitled to substantial deference and they are not "clearly erroneous."

The Defendants also argue that the district court was required to make "subsidiary findings" to support its conclusion that the sites had a hydrological connection to navigable waters, citing *Deal v. Cincinnati Bd. of Educ.*, 369 F.2d 55 (6th Cir. 1966). To the contrary, the district court's opinion, along with the expert testimony regarding the hydrological connection, provides a sufficient basis to examine the district court's findings and supports the determination that its conclusions were not clearly erroneous.

## II.  Dr. Willard's Testimony

At trial, the United States offered the expert testimony of Dr. Daniel E. Willard. The district court found Dr. Willard to be "eminently qualified" as an expert in wetlands and concluded that his testimony was "highly credible." The Defendants argue that this testimony should have been stricken, or the trial delayed, because Dr. Willard relied upon a supplemental expert witness report that was not disclosed until after trial was underway.

Dr. Willard revised the map he prepared for trial delineating the areas of wetland on the Rapanos' land. After examining the soil analysis from the Defendants' expert and

aerial photography, Dr. Willard revised his wetlands maps, removing some of the areas he had previously marked as wetlands. He did so to be "as conservative and as accurate as [he] could." The new maps were produced in conjunction with Will Bowman, a soils scientist with the Natural Resources Conservation Service of the U. S. Department of Agriculture, and were known as the "Bowman Supplemental Soils Maps." Accompanying the new maps was a five-page supplemental report. The Defendants contend that this late report "made a mockery of the Federal Rules of Civil Procedure," specifically complaining that the disclosure rules specified in Rule 26 were violated. They claim that the district court's denial of their motion for Rule 37 sanctions, based on the failure to disclose, requires remand for a new trial.

The United States points out that the new maps were based on analysis from the Defendants' experts contained in the Pierce report. The version of Rule 26(e) in effect at the time of the trial provided that a party was required to supplement its disclosures "if the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process." The data used in the supplemental report and maps was known to the Defendants, as it was produced by their experts. Because Dr. Willard's previous expert report and maps were available to the Defendants, it seems unlikely that simply incorporating some of the data from the Defendants' own experts, which *reduced* the computation of wetland areas, qualifies under Rule 26's mandatory disclosure requirements.

Even if we assume that the United States was required to disclose the supplemental results, exclusion of the report and testimony was not the only remedy available to the district court. Rule 37(c) provides sanctions for the failure to comply with Rule 26, including exclusion of evidence. This court reviews for abuse of discretion a district court's ruling on a motion to exclude an expert witness as a sanction under Rule

37 of the Federal Rules of Civil Procedure. *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003); *Toth v. Grand Trunk Railroad*, 306 F.3d 335, 344 (6th Cir. 2002). Rule 37 provides that the trial judge should not exclude expert testimony unless the failure to disclose is both unjustified and harmful. *Roberts*, 325 F.3d at 782; Fed. R.Civ. P. 37(c)(1) 2000 advisory committee's notes ("Even if the failure [to disclose] was not substantially justified, a party should be allowed to use the material that was not disclosed if the lack of earlier notice was harmless."). The non-disclosing party bears the burden of proving that a disclosure was harmless. *Roberts*, 325 F.3d at 782. The aggrieved party, however, must show substantial prejudice before this court will grant a new trial based on an alleged Rule 26(e) disclosure error. *Toth*, 306 F.3d at 344.

In this case, the failure to disclose seems harmless as the Defendants were aware of the data used in the supplemental reports and the revised reports *reduced* the amount of wetlands found to exist at the sites. Thus, the only changes made between the original disclosed report and the supplemental report were beneficial to the Defendants. In summary, no "substantial prejudice" has been demonstrated.

Even if a trial court determines that Rule 26 has been violated, Rule 37 does not mandate exclusion of evidence. *Roberts*, 325 F.3d at 783-84 (Rule 37(c)(1) "provides several remedies to a district judge who is faced with violations of the mandatory-disclosure provisions of Rule 26. The provision on sanctions explicitly states in pertinent part that 'in lieu of this sanction [of total exclusion], the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.'"). The district court, after noting its concern with the failure to disclose the supplemental report, concluded that

the defense should be accommodated and [I] will do so in several ways, [at] the option totally of the defense. Number one is that at the conclusion of the

Government's expert witness case, I would certainly give the defense as much reasonable time as they need in order to consult with their experts. I would be more than happy to . . . so that your expert can be prepared without having to order transcripts and so forth, have him or her on a phone conference so that they can hear all that testimony . . . so that you can be prepared and also take some time and recess for as long as you need in order to consult with your expert for cross-examination and if it entails taking whatever time it takes reasonably to be prepared. But I think that we're here to seek the truth, and that's -- that's the whole idea of having a trial is to seek the truth. It's not . . . to ambush and everybody should be prepared. . . . But I have to, I think, listen to the testimony to see what really transpired here with the understanding that we're here to seek the truth and that I will give the defense as much opportunity as they need since it's a bench trial and we can take time, and it's important, but not that important that you shouldn't have an opportunity to be able to use your right to cross-examine, to seek the truth.

The district court properly considered the role of the trial, the rights of the parties, and the considerations of the Federal Rules of Civil Procedure in this side-bar.

The Federal Rules of Civil Procedure are not so monolithic as to demand a single outcome for the widely varying circumstances encountered in discovery and trial. They properly recognize the discretion of the trial court to fashion appropriate remedies, taking into account the facts of the case. This case languished for more than five years between the filing of the Complaint and the 13-day bench trial. It involved complicated factual and legal issues. It was within the district court's discretion to allow the evidence and it significantly allayed any fears of undue surprise by granting the Defendants "as long as they needed" to review Dr. Willard's supplemental report so that they could discuss it with their experts.

Finally, Dr. Willard notified the Defendants during his deposition a few weeks before trial that he was in the process of amending his findings based upon the Pierce report. The Defendants apparently did not object to this until Dr. Willard testified and they never made a motion pursuant to Rule 37(a)(2)(A) to compel discovery. In *Roberts*, this court noted that such inaction by the "surprised" party suggests that the failure to disclose should be considered harmless or justified. *Roberts*, 325 F.3d at 783.

Considering all of the circumstances in this complicated case, the district court's failure to exclude Dr. Willard's supplemental reports cannot be said to be an "abuse of discretion" and its solution for the disclosure problem was entirely appropriate.

## III. The Michigan Wetlands Program

The CWA permits states to develop their own water protection permit program to enforce the provisions of the CWA. 33 U.S.C. § 1344(g). This partial delegation provision "gives a state the authority to render a comprehensive federal/state wetland permit decision with the federal government playing the role of the overseer in the consideration of permit applications." *Michigan Peat v. United States Envtl. Prot. Agency*, 175 F.3d 422, 424 (6th Cir.1999). Michigan, along with New Jersey, has established such a permitting program. 40 C.F.R. §§ 233.70-233.71.

The Defendants claim that Michigan's permitting regulations contain slight variations to the federal statutes. In particular, they cite Michigan's Geomare-Anderson Wetlands Protection Act, which has language defining wetlands that differ somewhat from the Corps' regulations. Mich. Comp. Laws § 324.30301(p). Those wetlands that are not contiguous to the Great Lakes, an inland lake or pond, or a river or stream, and less than five acres in size, are not subject to Michigan's Wetlands Protection Act, unless it is certified that the area's preservation is necessary to protect the natural

resources of the state. *Id*. § 324.30301(p)(ii). This five-acre jurisdictional limitation is not found in the CWA or the Code of Federal Regulations. The Defendants argue that it was error for the district court not to make findings of fact regarding the Michigan statute's five-acre limitation, instead focusing solely on the federal regulations.

While the CWA grants states the authority to establish their own clean water regulations, Congress clearly intended for any state program to be at least as broad as the federal program. *See* 33 U.S.C. § 1344(h)(1)(A)-(B). The Geomare-Anderson Wetlands Protection Act is a state statute separate from the CWA. The CWA's provision for state involvement in issuing CWA permits does not delegate authority to the state to alter application of the CWA and the Corps specifically notes that "[a]ny approved State Program shall, at all times, be conducted in accordance with the requirements of the Act and of this part. While States may impose more stringent requirements, they may not impose any less stringent requirements for any purpose." 40 C.F.R. § 233.1(d). Moreover, contrary to the Appellant's assertions, permitting a state to issue CWA permits does not foreclose all federal issuance of CWA permits. *See Michigan Peat*, 175 F.3d at 427 (a case in which the Corps had ultimate authority to issue permit when state permit did not address the concerns of the federal government); 33 U.S.C. § 1344(g)(1) (Corps still issues permits for waters used in interstate commerce, including adjacent wetlands).

The CWA explicitly provides that, notwithstanding the delegation of authority to the states, nothing in Section 1344 is meant to restrict the Corps' authority to enforce the CWA. 33 U.S.C. § 1344(n). This court has recognized that Section 1344(n) allows the federal government to pursue an action against an offender regardless of whether the state has instituted its own enforcement program, noting that under "the CWA . . . the responsible federal agency retains oversight power to ensure compliance with federal standards." *S. Ohio Coal Co. v. Office of Surface Mining,*

*Reclamation and Enforcement*, 20 F.3d 1418, 1427-28 (6th Cir. 1994); *see also United States v. City of Rock Island*, 182 F. Supp. 2d 690, 693-94 (C.D. Ill. 2001); *United States v. Town of Lowell*, 637 F. Supp. 254, 257 (N.D. Ind. 1985). The CWA does not contain any language suggesting that state implementation of the CWA is "in lieu of" federal enforcement and thus any delegation of authority to the state in the CWA does not end a citizen's responsibility to abide by the federal laws and regulations. *Cf. United States v. City of Youngstown*, 109 F. Supp. 2d 739, 741 (N.D. Ohio 2000).

In short, there is nothing in the CWA to suggest that by allowing Michigan to enforce portions of the CWA, the Corps was delegating the authority to the state to determine the limitations on CWA jurisdiction. Michigan does not gain the authority to alter the CWA's federal jurisdiction merely by virtue of the fact that it is entitled to administer some portions of the act. In fact, the statute and the accompanying regulations make it clear that state enforcement programs cannot act to weaken the CWA.

Finally, it should be noted that the Corps retains the ultimate authority to deny a CWA permit, even if Michigan is inclined to grant one under its delegation of authority. Michigan's Administration of Section 404 at 2 (available at http://www.deq.state.mi.us/documents/deq-lwm-wetlands-404admin.pdf); *see also Michigan Peat*, 175 F.3d at 427 (Michigan failed to issue a permit satisfying the federal government's reservations so the Corps retained the sole authority to authorize the issuance of a permit). In certifying Michigan's 404 permitting scheme, Michigan's Attorney General wrote that

> [t]he Water Resources Commission Act governing discharge of pollutants into water of this state includes within its ambit all waters of the State of Michigan. It is, of course, clear that the . . . Wetlands Act exclude from their purview certain lakes having an area of less than 5 acres. Even this problem is, in fact, of no practical

matter for a number of reasons. First, it is quite conceivable that a lake under 5 acres would have an affect on interstate commerce so as to imbue it with the distinction of being "water of the United States" and thus subject to the federal permit program.

Thus, Michigan's permitting program properly recognized that a site not falling within the ambit of Michigan's state program could still be within the jurisdiction of the federal program.

## IV. Collateral Estoppel

The district court found that Mr. Rapanos should be collaterally estopped from denying liability at the Salzburg site based on the outcome in the criminal case. Both parties note the confusion from relying upon collateral estoppel in this case because (1) the "Salzburg site" referenced in the criminal trial is not completely analogous to the Salzburg site in this case and (2) when the district court entered its findings of fact in 2000, Rapanos had been convicted in his trial and sentenced, but his appeal was pending, yet when the district court entered its final judgment in February 2003, Rapanos' conviction had been vacated by the criminal trial court and the United States' appeal to this court was pending. The United States notes the difficulty inherent in relying upon collateral estoppel when an appeal is pending.

Regardless, the district court's conclusion regarding collateral estoppel was not necessary for its finding that the Defendants were responsible for CWA violations at the Salzburg site. As discussed *supra*, the district court concluded that the Defendants had discharged fill into the Salzburg site and that the Salzburg site was subject to CWA jurisdiction. A judge may rely upon multiple alternative, but independent rationales for his decision. *See Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 909-10 (6th Cir. 2001) (discussing the effects on collateral estoppel when a decision is based upon two alternative, but independent

rationales).   In this case, it is unnecessary to determine whether collateral estoppel was appropriate because the district court provided alternate rationales for its findings.

## V.   The Extent of Unauthorized Filling

Finally, the Defendants contend that substantial evidence did not support the district court's finding that 54 acres of wetlands were illegally filled.  They claim that some of the fill used in the district court's calculation was "incidental fallback." The district court concluded that the illegal fill was substantial (covering 54 acres) and not the result of incidental fallback after examining the evidence and hearing the relevant testimony.  This conclusion is supported by the evidence and is not clearly erroneous.

## CONCLUSION

We **AFFIRM** the judgment of the district court.