In the

# United States Court of Appeals
### For the Seventh Circuit

No. 02-2045

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RUETH DEVELOPMENT CO.
and HAROLD G. RUETH,

*Defendants-Appellants.*

Appeal from the United States District Court for
the Northern District of Indiana, Hammond Division.
No. 2:96-cv-540—**James T. Moody**, *Judge.*

ARGUED APRIL 9, 2003—DECIDED JULY 10, 2003

Before FLAUM, *Chief Judge*, and POSNER and KANNE,
*Circuit Judges*.

FLAUM, *Chief Judge.* In 1996 the United States sued
the Rueth Development Company and Harold Rueth (col-
lectively "Rueth") under the Clean Water Act, 33 U.S.C.
§ 1251 *et seq.* ("CWA" or "the Act"), for failure to obtain a
permit before discharging dredged or fill material into
four acres of wetlands located in Dyer, Indiana. Rueth
chose to settle the suit and entered into a consent decree
that required him to restore the wetlands by specified
dates. When he failed to meet those deadlines, the gov-
ernment moved to enforce the agreement, seeking over
$6,750,000 in penalties. Rueth responded by petitioning for

modification or vacatur of the consent decree based on the Supreme Court's decision in *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159 (2001) ("*SWANCC*"), which he claimed was a material change in law affecting the decree's validity. The district court disagreed, granted the government's motion to enforce, and assessed penalties in the amount of $4,018,500, and Rueth appeals. We affirm.

## I. BACKGROUND

In April 1991 the Environmental Protection Agency ("EPA") issued an administrative compliance order under 33 U.S.C. § 1319(a), finding that Rueth had illegally discharged dredged or fill material into wetlands located in the Castlewood subdivision of southeastern Dyer. The fill was specifically found to have been placed in wetlands "adjacent to an unnamed tributary to Dyer Ditch, which flows north to Hart Ditch, which flows north to the Little Calumet River, which is a navigable water of the United States." The compliance order directed Rueth to cease all discharges and restore the wetlands to their original condition, warning that noncompliance could result in the assessment of substantial penalties under the CWA.

Rueth then proceeded to apply for an after-the-fact permit from the United States Army Corps of Engineers ("Corps"). The Corps declined to give approval, however, noting its concern that Rueth was presenting his development plans in a piecemeal fashion in an attempt to avoid a comprehensive review of their cumulative environmental impact. The Corps stated that it would reconsider its position if Rueth modified his plans so that less than ten acres of wetlands were affected.

Rueth did not submit new development plans, reapply for a permit, or undertake the restoration activities out-

lined in the administrative compliance order. Instead, he filed a complaint for equitable relief in the district court, claiming that the government lacked regulatory jurisdiction over the wetlands in the Castlewood subdivision. But because the administrative compliance order was a pre-enforcement action not subject to judicial review, the district court dismissed the suit, and we affirmed, stating that Rueth could contest jurisdiction if and when the EPA sought judicial or administrative enforcement of penalties against him. *Rueth v. EPA*, 13 F.3d 227, 230 (7th Cir. 1993) ("*Rueth I*"). We also remarked in passing,

> We acknowledge that our holding places Rueth somewhat in limbo until such time as the EPA seeks to enforce the compliance order or assess administrative penalties. . . . Responsibility for this predicament does not fall entirely on the EPA and the Corps of Engineers, as any reasonable and experienced developer such as Rueth should have known that the wetlands were potentially subject to regulation. Perhaps Rueth is in its present predicament because it attempted to short cut and take an end-run around the permit requirement. . . . Of course, Rueth now argues that it had no idea the wetlands at the Castlewood development were "waters of the United States" [within the meaning of the CWA]. As our decision in *Hoffman Homes, Inc. v. EPA*, 999 F.2d 256, 261 (7th Cir. 1993), makes clear, however, nearly all wetlands fall within the jurisdiction of the CWA since one test for whether the wetland affects interstate commerce is whether migratory birds use the wetland. Decisions such as *Hoffman Homes*, give full effect to Congress's intent to make the Clean Water Act as far-reaching as the Commerce Clause permits. On the other hand, it is not inconceivable that the EPA or the Corps of Engineers might completely overextend their authority. In such a case, we suggest to those agencies that we

will not hesitate to intervene in pre-enforcement activity, but this is not the case as we are of the opinion that the wetland at issue falls under the broad definition of "waters of the United States" in *Hoffman Homes*.

*Rueth I*, 13 F.3d at 230-31 (citation omitted).

By November 1996 Rueth had still not performed the tasks outlined in the administrative compliance order, prompting the government to file this enforcement action. The complaint asserted two bases for the government's regulatory jurisdiction: (1) adjacency—specifically, that the Castlewood wetlands were "adjacent to waters which flow into the Little Calumet River, an interstate stream, which itself is a 'water of the United States' within the meaning of the CWA," *see* 40 C.F.R. § 230.3(s)(7); and (2) effect on interstate commerce, *see id.* § 230.3(s)(3). In addition to injunctive relief, the complaint requested that the district court assess a civil penalty under 33 U.S.C. § 1319(d) for each day that Rueth was in violation of the CWA and the administrative compliance order.

After over a year of negotiations, the parties entered into a proposed consent decree, which the court then entered as a final judgment in January 1999. In the consent decree, Rueth agreed to perform a number of "milestone" tasks—such as excavating fill, sealing and raising storm sewers, and replacing wetland vegetation—by set deadlines. The agreement also required Rueth to pay a $23,000 civil penalty and set forth additional stipulated penalties that would result from failure to meet "any milestone" according to the specified timetable.

Rueth ultimately completed the wetland restoration at a cost of around $100,000 but failed to perform a number of the interim milestones in a timely fashion. Because of this failure, the government moved to enforce the stipulated-penalties provision of the consent decree, alleging that Rueth had "in very large part" disregarded his ob-

ligations under the agreement. For instance the government asserted that Rueth was 67 days late in paying the $23,500 penalty, 579 days late in excavating the fill and performing the storm-sewer tasks, and 158 days late in replacing the wetland vegetation. The government sought a separate stipulated penalty for each alleged violation of the agreement, resulting in a grand total of $6,757,500.

But before the district court could rule on the government's motion to enforce, Rueth moved under Fed. R. Civ. P. 60(b)(5) for modification or vacatur of the consent decree based on the Supreme Court's decision in *SWANCC*. Rueth claimed that *SWANCC*, which held that "navigable waters" as defined in the CWA does not extend to isolated intrastate waters solely because they are used as habitat by migratory birds, made "legal what the decree was designed to prevent," thus rendering it unenforceable. The district court disagreed, however. It concluded that *SWANCC* did not affect the validity of the decree because the government had not invoked the Migratory Bird Rule as a basis for its jurisdiction but sought rather "to regulate the [Castlewood] Site on the theory that it is an 'adjacent wetland.'" Then, the court made a factual finding that the Castlewood wetlands were "adjacent" to navigable waters because they have "an [effect] on flows to Dyer Ditch, and ultimately the Little Calumet River," which "is itself a navigable waterway." The court thus denied Rueth's Rule 60(b)(5) motion, granted the government's motion to enforce the consent decree, and imposed penalties in the amount of $4,018,500.

Rueth then moved under Rule 59(e) to alter or amend the judgment, claiming that there was no evidence whatsoever that the Castlewood wetlands were "adjacent" to a navigable waterway. He also claimed for the first time that the language of the consent decree did not allow for stipulated penalties to be separately imposed for each uncompleted or delayed "milestone" task. Though the dis-

trict court denied the motion, it agreed with Rueth that the question of "adjacency" was still open to dispute and therefore vacated that portion of its earlier order. Nonetheless, the court held that, even assuming the wetlands were isolated and not adjacent, Rueth was still not entitled to modification or vacatur of the consent decree because he waived his right to contest the government's regulatory jurisdiction by entering into the agreement. The court also upheld its award of stipulated penalties, and Rueth now appeals.

## II. Discussion

Section 404(a) of the CWA grants the Corps authority to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). "Navigable waters" is defined elsewhere in the Act as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). The Corps has in turn defined "waters of the United States" to include "waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce." 40 C.F.R. § 230.3(s)(3) (2003).

In *SWANCC* the Supreme Court held that § 230.3(s)(3),[1] as clarified by the Migratory Bird Rule, 51 Fed. Reg. 41217 (1986), exceeded the authority granted to the Corps under § 404(a) of the Act. The Migratory Bird Rule, which the Corps issued in 1986 to clarify the reach of its jurisdiction,

---

[1] Section 230.3(s)(3) was formerly codified at 33 C.F.R. § 328(a)(3) (1999). For simplicity we will cite to only § 230.3(s)(3) throughout this opinion.

had provided that § 404(a) extends to intrastate waters that provide habitat for migratory birds. But the Court concluded that nothing in the text of the statute indicated any Congressional intent to extend the jurisdiction of the Corps to "ponds that are *not* adjacent to open water." *SWANCC*, 531 U.S. at 168. Instead, § 404(a)'s use of the word "navigable" had "the import of showing . . . what Congress had in mind as its authority for enacting the CWA: its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *Id*. at 172.

The question before us now is what effect, if any, *SWANCC* has on the validity of the consent decree in this case. In moving to modify or vacate the decree, Rueth relied on the third clause of Fed. R. Civ. P. 60(b)(5), which provides that a court may relieve a party from a final judgment if "it is no longer equitable that the judgment should have prospective application." To obtain relief under this provision, Rueth bears the burden of showing "that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992). One instance where modification might be warranted is if the "statutory or decisional law has changed to make legal what the decree was designed to prevent." *Id*. at 388. Rueth contends that that is what *SWANCC* did here. Specifically, he asserts that *SWANCC* stripped the government of power to regulate the Castlewood wetlands because they are isolated and intrastate; therefore, the consent decree "is void *ab initio* and should be rescinded."

The government, not surprisingly, believes otherwise. Though the complaint did cite § 230.3(s)(3) as one basis for regulatory jurisdiction, the government claims that *SWANCC* is nonetheless irrelevant because the complaint did not specifically invoke the Migratory Bird Rule; instead, the alleged interstate-commerce nexus

under § 230.3(s)(3) "rested on other important ecological functions of the wetland, such as water filtration, flood control, and wildlife habitat." Essentially, the government is urging us to give *SWANCC* its narrowest reading possible—that use as habitat by migratory birds is insufficient to bring purely isolated, intrastate ponds within the Corps' jurisdiction under the CWA. Or, in other words, *SWANCC* did nothing more than invalidate the Migratory Bird Rule. Section 230.3(s)(3), however, extends the Corps' jurisdiction to intrastate waters for reasons other than those having to do with use by migratory birds. For instance it includes waters that "are or could be used by interstate or foreign travelers for recreational or other purposes," waters "[f]rom which fish or shellfish are or could be taken and sold in interstate or foreign commerce," and waters that "are used or could be used for industrial purposes by industries in interstate commerce." The government claims that *SWANCC* left these provisions intact, whereas Rueth claims that *SWANCC* deprived the Corps of all power to regulate any intrastate water based on a nexus to interstate commerce. We conclude that they are both partly right—the government because *SWANCC* does not *expressly* make § 230.3(s)(3) illegal, and Rueth because his reading ultimately may be the only logical extension of the case. The Court's concern with the Migratory Bird Rule was that it conferred regulatory jurisdiction over waters that were not actually or potentially "navigable"; § 230.3(s)(3) suffers from the same infirmity. For instance, that fish or shellfish can be taken from a water and sold in interstate commerce does not make that water any more "navigable" than it would be if it were frequented by migratory birds. The same holds true for intrastate waters that are used by interstate travelers or for industrial purposes by industries in interstate commerce.

But what effect *SWANCC* has on the Corps' jurisdiction under § 230.3(s)(3) is a question that we need not decide

in this case. For it is clear that *SWANCC* did not affect the law regarding the government's alternative asserted basis for jurisdiction—adjacency under § 230.3(s)(7). The Corps' adjacency jurisdiction is well-established; it was upheld by the Supreme Court in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), and was reaffirmed in *SWANCC*. Recognizing this, Rueth offers a number of reasons why we should find that the Corps lacks adjacency jurisdiction here. First, he claims that the government has offered no evidence that the Castlewood wetlands are actually adjacent to navigable waters. But this is beside the point. The government never had to present such evidence because of the very fact that Rueth chose not to litigate the case. Rueth also points out that the district court's order denying his post-judgment motion "assumed" that the wetlands are isolated and not adjacent. He attaches too much significance to the court's assumption, however; the court proceeded on the theory that the wetlands are not adjacent only because it thought that Rueth would lose regardless. Finally, Rueth asserts that the wetlands' link to navigable waters is too attenuated to establish adjacency, alleging that the wetlands are "merely adjacent to a tertiary tributary of a navigable water (adjacent to an unnamed tributary of Dyer Ditch which is a tributary of Hart Ditch which is a tributary of the Little Calumet River)." But this simply raises the question of what "adjacency" means, which *SWANCC* did not address at all. Rueth, moreover, waived his right to litigate the issue when he signed the consent decree. And further, it is not even apparent that the necessary contiguity to a navigable water is missing here. In *Riverside Bayview Homes,* the Court found mere surface runoff into nearby navigable waters to be a meaningful enough connection to give rise to the Corps' adjacency jurisdiction. 474 U.S. at 134. And recently, in *United States v. Deaton*, No. 02-1442, 2003 WL 21357305 (4th Cir. June 12, 2003), the Fourth Circuit upheld the Corps' exercise of adjacency

jurisdiction over a parcel of land whose only connection to navigable waters was surface runoff that, after a "winding, thirty-two-mile path," emptied into the Chesapeake Bay.[2]

Despite the government's assertion of adjacency jurisdiction, Rueth seems to suggest that it would nonetheless be manifestly unfair to hold him to the terms of the consent decree because, at the time he settled the case, the law was well-established that the Corps *could* exercise jurisdiction over isolated intrastate waters. As Rueth points out, we told him in his first appeal that "nearly all wetlands fall within the jurisdiction of the CWA since one test for whether the wetland affects interstate commerce is whether migratory birds use the wetland." *Rueth I*, 13 F.3d at 231 (citing *Hoffman Homes, Inc. v. EPA*, 999 F.2d 256, 261 (7th Cir. 1993)). This statement is obviously no longer accurate after *SWANCC*, but regardless, we fail to see how it has any effect on the validity of the decree. Back when the EPA filed its complaint in 1996, Rueth was faced with a choice: he could either contest the government's jurisdiction or forego the costs and settle the case. Having reasonably concluded that his chances of succeeding on the jurisdictional challenge were not good, Rueth chose the latter course. The defendants

---

[2] As the court described it, the surface runoff drained into a roadside ditch, which in turn "drain[ed] into a culvert under Morris Leonard Road. On the other side of the road, the culvert drain[ed] into another ditch, known as the John Adkins Prong of Perdue Creek. Perdue Creek flows into Beaverdam Creek, a natural watercourse with several dams and ponds. Beaverdam Creek is a direct tributary of the Wicomico river, which is navigable. Beaverdam Creek empties into the Wicomico River about eight miles from the [defendants'] property. About twenty-five river miles further downstream, the Wicomico River flows into the Chesapeake Bay, a vast body of navigable water." *Id.*, 2003 WL 21357305, at *2.

in *SWANCC* chose the former. Now, Rueth seeks a free ride on the defendants' success in *SWANCC*, but the mere fact that the Supreme Court has cast doubt on one of the complaint's legal bases is not a ground on which to reopen the case. *See United States v. Krilich*, 303 F.3d 784, 792 (7th Cir. 2002) ("*Krilich III*"); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 131 F.3d 625, 628-29 (7th Cir. 1997). As we stated in *Krilich III*, which also involved a Rule 60(b)(5) motion to vacate a consent decree based on *SWANCC,*

> If a party believes that the waters at issue on his own property are not properly subject to the EPA's authority, whether under the rationale of *Hoffman Homes I*, *SWANCC* or under some other theory, he should not stipulate otherwise. But that is exactly what Krilich did, to his continued dismay. He expressly agreed that certain waters on his property constituted "waters of the United States," subject to regulation by the EPA. Like most parties that enter into a settlement or plea agreement, he presumably made a tactical decision that the terms of the Consent Decree were more favorable than the costs or risks of continued litigation. Accordingly, we conclude that *SWANCC* effected no relevant change in decisional law such that the district court should have modified the Consent Decree. Nor does *SWANCC* establish that the EPA's entry into and continued enforcement of the Consent Decree are *ultra vires* acts. "To hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected consent decree would undermine the finality of such agreements and could serve as a disincentive to negotiation of settlements in . . . litigation."

*Id.* (quoting *Rufo*, 502 U.S. at 389).

Rueth spends much of his brief explaining how *Krilich III* is distinguishable from this case, but ultimately the

distinction comes down to this: in *Krilich III* the defendant had conceded that there was some basis for the Corps' jurisdiction other than effect on interstate commerce, whereas here, Rueth conceded only that there was *some* basis for jurisdiction. But this is a distinction without a difference. Even assuming Rueth is right that *SWANCC* made illegal the government's assertion of jurisdiction under § 230(s)(3), if the case is reopened, the parties would still have to litigate whether the government has adjacency jurisdiction under § 230(s)(7). Six years ago, however, Rueth made the conscious decision, given the uncertainties of litigation, not to contest that issue. It would render the consent decree worthless to allow him to do so now. *See Rufo*, 502 U.S. at 389.[3]

So the district court was right not to modify or vacate the consent decree, but Rueth maintains that, even so, the court erred for several reasons in calculating the stipulated penalties. He first contends that the language of the decree does not support the imposition of cumulative stipulated penalties for each uncompleted "milestone" task; rather, according to Rueth's reading, the court should have imposed penalties based on *days* of noncompliance regardless of the number of violations, which would have reduced the total penalty to less than $1.5 million. Unfortunately for Rueth, he has waived this claim by raising it for the first time in his Rule 59(e) motion.[4] *Anderson v. Flexel, Inc.*, 47 F.3d 243, 247 (7th Cir. 1995). The govern-

---

[3] Rueth might have an additional problem in that the relief he seeks—mainly, to be excused from paying the stipulated penalties that accrued as a result of his missing the deadlines set forth in the decree—may not be "prospective" in nature. Fed. R. Civ. P. 60(b)(5). There is no need for us to address this issue, however.

[4] Notably, the district court did not even mention the claim in its order denying Rueth's motion.

ment made clear in its motion to enforce that it was seeking a separate penalty for each violation of the decree. Yet in his opposition to the motion, Rueth did not argue that the stipulated-penalty provision was unclear on its face but asserted only that the penalties sought were "unconscionable and unenforceable" because they "bear no rational relationship to the potential harm which the plaintiff could have reasonably foreseen at the time it prepared the Consent Decree, and because the size of the penalties is grossly disproportionate to the degree of harm to the EPA or the environment resulting from the alleged delays." Not until his Rule 59(e) motion did Rueth raise any question regarding the proper construction of the stipulated-penalty provision. Further, even had Rueth not waived his claim, we find the government's interpretation of the decree to be the more reasonable one in any event. We agree with Rueth that the stipulated-penalty provision is facially ambiguous, so in order to resolve the ambiguity we must "look at the evil which the decree was designed to rectify." *Goluba v. Sch. Dist. of Ripon*, 45 F.3d 1035, 1038 (7th Cir. 1995) (quotations omitted). The clear intent of this decree was to require Rueth to restore the wetlands by performing six discrete milestone tasks in a relatively short (eleven-month) timeframe. Rueth knew that he had to comply with all six milestones in order to be in compliance with the CWA. Yet if he is right that the stipulated penalties accrue only by *day* of violation rather than per violation, there would be no incentive for him to complete any of the other five tasks if he is in violation of one. For this reason we cannot sustain Rueth's interpretation of the decree. To do so would render the number of violations irrelevant to the total penalty, which would in turn contravene the intent of the parties at the time the contract was made.

Rueth's next argument is that the district court erred by failing to hold a hearing to determine whether the EPA

had consented to the delays in completing the storm-sewer tasks. The consent decree, however, has a *force majeure* provision, which states that untimely performance would only be excused if Rueth provided a written request to the EPA. Rueth did not present any evidence that he did so. Thus, pursuant to the express terms of the decree, Rueth waived his right to obtain an extension of the deadlines, and so the court did not err in refusing to hear evidence on his claim that the decree had been orally modified. *See United States v. Alshabkhoun*, 277 F.3d 930, 936 (7th Cir. 2002); *United States v. Krilich*, 126 F.3d 1035, 1036-37 (7th Cir. 1997).

Rueth also contends that, before the court imposed the penalty, it should have considered the statutory criteria (such as seriousness of the violation and ability to pay) provided in the CWA. 33 U.S.C. § 1319(d). His argument is without support. Rueth negotiated and freely entered into the consent decree and is therefore bound by its terms, including those setting forth penalties, *see Alshabkhoun*, 277 F.3d at 935; the statutory factors no longer have any relevance. Likewise meritless is Rueth's argument that the penalties violate due process. Their apparent severity is due to the fact that Rueth was so negligent in complying with the decree that he himself negotiated; indeed, he was up to 579 days late in completing some of the milestone tasks. Given these circumstances we cannot say that the penalty amount is unreasonable, especially considering that it is but a small fraction of the maximum penalty that could have been imposed under the CWA. *See id.*

## III. CONCLUSION

The district court did not err in denying Rule 60(b)(5) or 59(e) relief, and so the judgment is AFFIRMED.

No. 02-2045 15

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*