Justice Stevens,
with whom
Justice Souter, Justice Ginsburg, and Justice Breyer join, dissenting.
In 1972, Congress decided to “restore and maintain the chemical, physical, and biological integrity of the Nation’s waters” by passing what we now call the Clean Water Act, 86 Stat. 816, as amended, 33 U. S. C. § 1251 et seq. The costs of achieving the Herculean goal of ending water pollution by 1985, see § 1251(a), persuaded President Nixon to veto its enactment, but both Houses of Congress voted to override that veto by overwhelming margins. To achieve its goal, Congress prohibited “the discharge of any pollutant” — defined to include “any addition of any pollutant to navigable waters from any point source” — without a permit issued by the Army Corps of Engineers (Army Corps or Corps) or the Environmental Protection Agency (EPA). §§ 1311(a), 1362(12)(A). Congress further defined “navigable waters” to mean “the waters of the United States.” § 1362(7).
The narrow question presented in No. 04-1034 is whether wetlands adjacent to tributaries of traditionally navigable waters are “waters of the United States” subject to the jurisdiction of the Army Corps; the question in No. 04-1384 is whether a manmade berm separating a wetland from the adjacent tributary makes a difference. The broader question is whether regulations that have protected the quality of our waters for decades, that were implicitly approved by Congress, and that have been repeatedly enforced in case after case, must now be revised in light of the creative criticisms *788 voiced by the plurality and Justice Kennedy today. Rejecting more than 30 years of practice by the Army Corps, the plurality disregards the nature of the congressional delegation to the agency and the technical and complex character of the issues at stake. Justice Kennedy similarly fails to defer sufficiently to the Corps, though his approach is far more faithful to our precedents and to principles of statutory interpretation than is the plurality’s.
In my view, the proper analysis is straightforward. The Army Corps has determined that wetlands adjacent to tributaries of traditionally navigable waters preserve the quality of our Nation’s waters by, among other things, providing habitat for aquatic animals, keeping excessive sediment and toxic pollutants out of adjacent waters, and reducing downstream flooding by absorbing water at times of high flow. The Corps’ resulting decision to treat these wetlands as encompassed within the term “waters of the United States” is a quintessential example of the Executive’s reasonable interpretation of a statutory provision. See Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 842-845 (1984).
Our unanimous decision in United States v. Riverside Bayview Homes, Inc., 474 U. S. 121 (1985), was faithful to our duty to respect the work product of the Legislative and Executive Branches of our Government. Today’s judicial amendment of the Clean Water Act is not.
I
At each of the three sites at issue in No. 04-1034, the petitioners filled large areas of wetlands without permits, despite being on full notice of the Corps’ regulatory requirements. Because the plurality gives short shrift to the facts of this case — as well as to those of No. 04-1384 — I shall discuss them at some length.
The facts related to the 230-acre Salzburg site are illustrative. In 1988, John Rapanos asked the Michigan Depart *789 ment of Natural Resources (MDNR) to inspect the site “in order to discuss with him the feasibility of building a shopping center there.” App. to Pet. for Cert, in No. 04-1034, p. B15. An MDNR inspector informed Rapanos that the land probably included wetlands that were “waters of the United States” and sent him an application for a permit under § 404 of the Act.[1] Rapanos then hired a wetland consultant, Dr. Frederick Goff. After Dr. Goff concluded that the land did in fact contain many acres of wetlands, “Rapanos threatened to ‘destroy’ Dr. Goff if he did not destroy the wetland report, and refused to pay Dr. Goff unless and until he complied.” Ibid. In the meantime, without applying for a permit, Rapanos hired construction companies to do $350,000 worth of work clearing the land, filling in low spots, and draining subsurface water. After Rapanos prevented MDNR inspectors from visiting the site, ignored an MDNR cease-and-desist letter, and refused to obey an administrative compliance order issued by the EPA, the matter was referred to the Department of Justice. In the civil case now before us, the District Court found that Rapanos unlawfully filled 22 acres of wetlands.
Rapanos and his wife engaged in similar behavior at the Hines Road and Pine River sites. Without applying for § 404 permits, they hired construction companies to perform extensive clearing and filling activities. They continued these activities even after receiving EPA administrative compliance orders directing them to cease the work immediately. They ultimately spent $158,000 at the 275-acre Hines Road site, filling 17 of its existing 64 acres of wetlands. At the 200-acre Pine River site, they spent $463,000 and filled 15 of its 49 acres of wetlands.
Prior to their destruction, the wetlands at all three sites had surface connections to tributaries of traditionally navigable waters. The Salzburg wetlands connected to a drain *790 that flows into a creek that flows into the navigable Kawkawlin River. The Hines Road wetlands connected to a drain that flows into the navigable Tittabawassee River. And the Pine River wetlands connected with the Pine River, which flows into Lake Huron.
At trial, the Government put on a wetland expert, Dr. Daniel Willard, whom the trial court found “eminently qualified” and “highly credible.” Id., at B7. Dr. Willard testified that the wetlands at these three sites provided ecological functions in terms of “habitat, sediment trapping, nutrient recycling, and flood peak diminution.” 4 Tr. 96 (Apr. 5, 1999).[2] He explained:
“[Generally for all of the . . . sites we have a situation in which the flood water attenuation in that water is held on the site in the wetland . .. such that it does not add to flood peak. By the same token it would have some additional water flowing into the rivers during the drier periods, thus, increasing low water flow.
“By the same token on all of the sites to the extent that they slow the flow of water of the site they will also accumulate sediment and thus trap sediment and hold nutrients for use in those wetland systems later in the season as well.” Id., at 95-96.
The District Court found that the wetlands at all three sites were covered by the Clean Water Act and that the Rapanoses had violated the Act by destroying them without permits. The Sixth Circuit unanimously affirmed. 376 F. 3d 629 (2004).
The facts of No. 04-1384 are less dramatic. The petitioners in that case own a 20-acre tract of land, of which 16 acres are wetlands, located in Macomb County a mile from Lake *791 St. Clair. These wetlands border a ditch that flows into a drain that flows into a creek that flows into Lake St. Clair. A 4-foot-wide manmade berm separates the wetlands from the ditch; thus water rarely if ever passes from wetlands to ditch or vice versa.
Petitioners applied for a permit to fill most of these wetlands with 57,500 cubic yards of material. They intended to build a 112-unit condominium development on the site. After inspecting the site and considering comments from, among others, the Water Quality Unit of the Macomb County Prosecutor’s Office (which urged the Corps to deny the permit because “[t]he loss of this high quality wetland area would have an unacceptable adverse effect on wildlife, water quality, and conservation of wetlands resources,” App. in No. 04-1384, p. 79a), the Corps denied the permit. Id., at 84a-126a. As summarized in a letter sent to petitioners, reasons for denial included:
“Your parcel is primarily a forested wetland that provides valuable seasonal habitat for aquatic organisms and year round habitat for terrestrial organisms. Additionally, the site provides water storage functions that, if destroyed, could result in an increased risk of erosion and degradation of water quality in the SutherlandOemig Drain, Auvase Creek, and Lake St. Clair. The minimization of impacts to these wetlands is important for conservation and the overall ecology of the region. Because the project development area is a forested wetland, the proposed project would destroy the resources in such a manner that they would not soon recover from impacts of the discharges. The extent of impacts in the project area when considered both individually and cumulatively would be unacceptable and contrary to the public interest.” Id., at 127a-128a.
As in No. 04-1034, the unanimous judgment of the District and Circuit Judges was that the Corps has jurisdiction over *792 this wetland because it is adjacent to a tributary of traditionally navigable waters. 391 F. 3d 704 (CA6 2004). The Solicitor General defends both judgments.
II
Our unanimous opinion in Riverside Bayview squarely controls these cases. There, we evaluated the validity of the very same regulations at issue today. These regulations interpret “waters of the United States” to cover all traditionally navigable waters; tributaries of these waters; and wetlands adjacent to traditionally navigable waters or their tributaries. 33 CFR §§ 328.3(a)(1), (5), and (7) (2005); §§ 323.2(a)(1), (5), and (7) (1985). Although the particular wetland at issue in Riverside Bayview abutted a navigable creek, we framed the question presented as whether the Clean Water Act “authorizes the Corps to require landowners to obtain permits from the Corps before discharging fill material into wetlands adjacent to navigable bodies of water and their tributaries.” 474 U. S., at 123 (emphasis added).[3]
*793 We held that, pursuant to our decision in Chevron,
“our review is limited to the question whether it is reasonable, in light of the language, policies, and legislative history of the Act for the Corps to exercise jurisdiction over wetlands adjacent to but not regularly flooded by rivers, streams, and other hydrographic features more conventionally identifiable as ‘waters.’ ” 474 U. S., at 131.
Applying this standard, we held that the Corps’ decision to interpret “waters of the United States” as encompassing such wetlands was permissible. We recognized the practical difficulties in drawing clean lines between land and water, id., at 132, and deferred to the Corps’ judgment that treating adjacent wetlands as “waters” would advance the “congressional concern for protection of water quality and aquatic ecosystems,” id., at 133.
Contrary to the plurality’s revisionist reading today, ante, at 740-742, 746-747, Riverside Bayview nowhere implied that our approval of “adjacent” wetlands was contingent upon an understanding that “adjacent” means having a “continuous surface connection” between the wetland and its neighboring creek, ante, at 742. Instead, we acknowledged that the Corps defined “adjacent” as including wetlands “ ‘that form the border of or are in reasonable proximity to other waters’” and found that the Corps reasonably concluded that adjacent wetlands are part of the waters of the United States. 474 U. S., at 134 (quoting 42 Fed. Reg. 37128 (1977)). Indeed, we explicitly acknowledged that the Corps’ jurisdictional determination was reasonable even though
“not every adjacent wetland is of great importance to the environment of adjoining bodies of water.... If it is *794 reasonable for the Corps to conclude that in the majority of cases, adjacent wetlands have significant effects on water quality and the ecosystem, its definition can stand. That the definition may include some wetlands that are not significantly intertwined with the ecosystem of adjacent waterways is of little moment, for where it appears that a wetland covered by the Corps’ definition is in fact lacking in importance to the aquatic environment... the Corps may always allow development of the wetland for other uses simply by issuing a permit.” 474 U. S., at 135, n. 9.
In closing, we emphasized that the scope of the Corps’ asserted jurisdiction over wetlands had been specifically brought to Congress’ attention in 1977, that Congress had rejected an amendment that would have narrowed that jurisdiction, and that even proponents of the amendment would not have removed wetlands altogether from the definition of “waters of the United States.” Id., at 135-139.
Disregarding the importance of Riverside Bayview, the plurality relies heavily on the Court’s subsequent opinion in Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers, 531 U. S. 159 (2001) (SWANCC). In stark contrast to Riverside Bayview, however, SWANCC had nothing to say about wetlands, let alone about wetlands adjacent to traditionally navigable waters or their tributaries. Instead, SWANCC dealt with a question specifically reserved by Riverside Bayview, see n. 3, supra, namely, the Corps’ jurisdiction over isolated waters — “ ‘waters that are not part of a tributary system to interstate waters or to navigable waters of the United States, the degradation or destruction of which could affect interstate commerce.’ ” 531 U. S., at 168-169 (quoting 33 CFR § 323.2(a)(5) (1978); emphasis added); see also 531 U.S., at 163 (citing 33 CFR § 328.2(a)(3) (1999), which is the later regulatory equivalent to § 323.2(a)(5) (1978)). At issue in SWANCC was “an abandoned sand and gravel pit. . . which provide[d] habitat for migratory birds” *795 and contained a few pools of “nonnavigable, isolated, intrastate waters.” 531 U. S., at 162, 166. The Corps had asserted jurisdiction over the gravel pit under its 1986 Migratory Bird Rule, which treated isolated waters as within its jurisdiction if migratory birds depended upon these waters. The Court rejected this jurisdictional basis since these isolated pools, Unlike the wetlands at issue in Riverside Bayview, had no “significant nexus” to traditionally navigable waters. 531 U. S., at 167. In the process, the Court distinguished Riverside Bayview’s reliance on Congress’ decision to leave the Corps’ regulations alone when it amended the Act in 1977, since “ '[i]n both Chambers, debate on the proposals to narrow thé definition of navigable waters centered largely on the issue of wetlands preservation’ ” rather than on the Corps’ jurisdiction over truly isolated waters. 531 U. S., at 170 (quoting 474 U. S., at 136).[4]
*796 Unlike SWANCC and like Riverside Bayview, the cases before us today concern wetlands that are adjacent to “navigable bodies of water [or] their tributaries,” 474 U. S., at 123. Specifically, these wetlands abut tributaries of traditionally navigable waters. As we recognized in Riverside Bayview, the Corps has concluded that such wetlands play important roles in maintaining the quality of their adjacent waters, see id., at 134-135, and consequently in the waters downstream. Among other things, wetlands can offer “nesting, spawning, rearing and resting sites for aquatic or land species”; “serve as valuable storage areas for storm and flood waters”; and provide “significant water purification functions.” 33 CFR § 320.4(b)(2) (2005); 474 U. S., at 134-135. These values are hardly “independent” ecological considerations as the plurality would have it, ante, at 741 — instead, they are integral to the “chemical, physical, and biological integrity of the Nation’s waters,” 33 U. S. C. § 1251(a). Given that wetlands serve these important water quality roles and given the ambiguity inherent in the phrase “waters of the United States,” the Corps has reasonably interpreted its jurisdiction to cover nonisolated wetlands. See 474 U. S., at 131-135.[5]
*797 This conclusion is further confirmed by Congress’ deliberate acquiescence in the Corps’ regulations in 1977. Id., at 136. Both Chambers conducted extensive debates about the Corps’ regulatory jurisdiction over wetlands, rejected efforts to limit this jurisdiction, and appropriated funds for a “ ‘National Wetlands Inventory’ ” to help the States “ ‘in the development and operation of programs under this Act.’” Id., at 135-139 (quoting 33 U. S. C. § 1288(i)(2)). We found these facts significant in Riverside Bayview, see 474 U. S., at 135-139, as we acknowledged in SWANCC, see 531 U. S., at 170-171 (noting that “[bjeyond Congress’ desire to regulate wetlands adjacent to ‘navigable waters,’ respondents-point us to no persuasive evidence” of congressional acquiescence (emphasis added)).
The Corps’ exercise of jurisdiction is reasonable even though not every wetland adjacent to a traditionally navigable water or its tributary will perform all (or perhaps any) of the water quality functions generally associated with wetlands. Riverside Bayview made clear that jurisdiction does not depend on a wetland-by-wetland inquiry. 474 U. S., at 135, n. 9. Instead, it is enough that wetlands adjacent to tributaries generally have a significant nexus to the watershed’s water quality. If a particular wetland is “not significantly intertwined with the ecosystem of adjacent waterways,” then the Corps may allow its development “simply by issuing a permit.” Ibid.[6] Accordingly, for purposes of the Corps’ jurisdiction it is of no significance that the wetlands in No. 04-1034 serve flood control and sediment sink func *798 tions, but may not do much to trap other pollutants, supra, at 790, and n. 2, or that the wetland in No. 04-1384 keeps excess water from Lake St. Clair but may not trap sediment, see supra, at 790-792.
Seemingly alarmed by the costs involved, the plurality shies away from Riverside Bayview’s recognition that jurisdiction is not a case-by-case affair. I do not agree with the plurality’s assumption that the costs of preserving wetlands are unduly high. It is true that the cost of § 404 permits are high for those who must obtain them[7] — but these costs amount to only a small fraction of 1% of the $760 billion spent each year on private and public construction and development activity. Sunding & Zilberman 80. More significant than the plurality’s exaggerated concern about costs, however, is the fact that its omission of any discussion of the benefits that the regulations at issue have produced sheds a revelatory light on the quality (and indeed the impartiality) of its cost-benefit analysis.[8] The importance of wetlands *799 for water quality is hard to overstate. See, e. g., U. S. Congress, Office of Technology Assessment, Wetlands: Their Use and Regulation, OTA-O-206, pp. 43-61 (Mar. 1984), http://govinfo.library.unt.edu/ota/OTA_4/DATA/1984/ 8433.pdf (hereinafter OTA) (describing wetlands’ role in floodpeak reduction, shoreline protection, ground water recharge, trapping of suspended sediment, filtering of toxic pollutants, and protection of fish and wildlife). See also ante, at 777 (Kennedy, J., concurring in judgment). Unsurprisingly, the Corps’ approach has the overwhelming endorsement of numerous amici curiae, including 33 States and the county in which the property in No. 04-1384 is located.
In final analysis, however, concerns about the appropriateness of the Corps’ 30-year implementation of the Clean Water Act should be addressed to Congress or the Corps rather than to the Judiciary. Whether the benefits of particular conservation measures outweigh their costs is a classic question of public policy that should not be answered by appointed judges. The fact that large investments are required to finance large developments merely means that those who are most adversely affected by the Corps’ permitting decisions are persons who have the ability to communicate effectively with their representatives. Unless and until they succeed in convincing Congress (or the Corps) that clean water is less important today than it was in the 1970’s, we continue to owe deference to regulations satisfying the “evident breadth of congressional concern for protection of water quality and qquatic ecosystems” that all of the Justices on the Court in 1985 recognized in Riverside Bayview, 474 U. S., at 133.
*800 III
Even setting aside the plurality’s dramatic departure from our reasoning and holding in Riverside Bayview, its creative opinion is utterly unpersuasive. The plurality imposes two novel conditions on the exercise of the Corps’ jurisdiction that can only muddy the jurisdictional waters. As Justice Kennedy observes, “these limitations .. . are without support in the language and purposes of the Act or in our cases interpreting it.” Ante, at 768 (opinion concurring in judgment). The impropriety of crafting these new conditions is highlighted by the fact that no party or amicus has suggested either of them.[9]
First, ignoring the importance of preserving jurisdiction over water beds that are periodically dry, the plurality imposes a requirement that only tributaries with the “relatively permanent” presence of water fall within the Corps’ jurisdiction. Ante, at 732. Under the plurality’s view, then, the Corps can regulate polluters who dump dredge into a stream that flows year round but may not be able to regulate polluters who dump into a neighboring stream that flows for only 290 days of the year — even if the dredge in this second stream would have the same effect on downstream waters as the dredge in the year-round one. Ante, at 732-733, n. 5.[10]
*801 To find this arbitrary distinction compelled by the statute, the plurality cites a dictionary for a proposition that it does not contain. The dictionary treats “streams” as “waters” but has nothing to say about whether streams must contain water year round to qualify as “streams.” Ante, at 732-733, and n. 6 (citing Webster’s New International Dictionary 2493 (2d ed. 1954) (hereinafter Webster’s Second), as defining stream as a “ ‘current or course of water or other fluid, flowing on the earth’ ”). Prom this, the plurality somehow deduces that streams can never be intermittent or ephemeral (i. e., flowing for only part of the year). Ante, at 732-734, and nn. 5-6. But common sense and common usage demonstrate that intermittent streams, like perennial streams, are still streams.[11] See, e. g., U. S. Dept, of Interior, U. S. Geological Survey, Topographic Map Symbols 3 (2005), http://erg.usgs.gov/isb/pubs/booklets/symbols/ (identifying symbols for “[p]erennial stream” and “[intermittent stream,” as well as for “[p]erennial river” and “[intermittent river”). This was true well before the passage of the Act in 1972. E. g., Webster’s Third New International Dictionary 1180 (1961) (hereinafter Webster’s Third) (linking “intermittent” with “stream”). Indeed, we ourselves have used the term “intermittent stream” as far back as 1932. Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U. S. 334, 335 (1933). Needless to say, Justice Brandéis’ use of the term in a unanimous opinion should not be dismissed as merely a “useful oxymor[on],” ante, at 733, n. 6 (plurality opinion).
*802 The plurality attempts to bolster its arbitrary jurisdictional line by citing two tangential statutory provisions and two inapplicable canons of construction. None comes close to showing that Congress directly spoke to whether “waters” requires the relatively permanent presence of water.
The first provision relied on by the plurality — the definition of “point source” in 33 U. S. C. § 1362(14) — has no conceivable bearing on whether permanent tributaries should be treated differently from intermittent ones, since “pipe[s], ditch[es], channels], tunnel[s], eonduit[s], [and] well[s]” can all hold water permanently as well as intermittently.[12] The second provision is § 1251(b), which announces a congressional policy to “recognize, preserve, and protect the primary responsibilities and rights of States” to prevent pollution, to plan development, and to consult with the EPA. Under statutory additions made in 1977 when Congress considered and declined to alter the Corps’ interpretation of its broad *803 regulatory jurisdiction, the States may run their own § 404 programs. §§ 1344(g)-(h). As modified, § 1251(b) specifically recognizes this role for the States as part of their primary responsibility for preventing water pollution. Even focusing only on the Act as it stood between 1972 and 1977, but see International Paper Co. v. Ouellette, 479 U. S. 481, 489-490 (1987) (interpreting § 1251(b) in light of the 1977 additions), broad exercise of jurisdiction by the Corps still left the States with ample rights and responsibilities. See S. D. Warren Co. v. Maine Bd. of Environmental Protection, ante, at 386-387. States had the power to impose tougher water pollution standards than required by the Act, § 1370, and to prevent the Corps and the EPA from issuing permits, § 1341(a)(1) — not to mention nearly exclusive responsibility for containing pollution from nonpoint sources.
The two canons of construction relied on by the plurality similarly fail to overcome the deference owed to the Corps. First, the plurality claims that concerns about intruding on state power to regulate land use compel the conclusion that the phrase “waters of the United States” does not cover intermittent streams. As we have recognized, however, Congress found it “ ‘essential that discharge of pollutants be controlled at the source,’ ” Riverside Bayview, 474 U. S., at 133 (quoting S. Rep. No. 92-414, p. 77 (1972)), and the Corps can define “waters” broadly to accomplish this aim. Second, the plurality suggests that the canon of constitutional avoidance applies because the Corps’ approach might exceed the limits of our Commerce Clause authority. Setting aside whether such a concern was proper in SWANCC, 531 U. S., at 173; but see id., at 192-196 (Stevens, J., dissenting), it is plainly not warranted here. The wetlands in these cases are not “isolated” but instead are adjacent to tributaries of traditionally navigable waters and play important roles in the watershed, such as keeping water out of the tributaries or absorbing water from the tributaries. “There is no constitutional reason why Congress cannot, under the commerce power, *804 treat the watersheds as a key to flood control on navigable streams and their tributaries.” Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U. S. 508, 525 (1941).
Most importantly, the plurality disregards the fundamental significance of the Clean Water Act. As then-justice Rehnquist explained when writing for the Court in 1981, the Act was “not merely another law” but rather was “viewed by Congress as a ‘total restructuring’ and ‘complete rewriting’ of the existing water pollution legislation.” Milwaukee v. Illinois, 451 U. S. 304, 317. “Congress’ intent in enacting the [Act] was clearly to establish an all-encompassing program of water pollution regulation,” and “[t]he most casual perusal of the legislative history demonstrates that... views on the comprehensive nature of the legislation were practically universal.” Id., at 318, and n. 12; see also 531 U. S., at 177-181 (Stevens, J., dissenting). The Corps has concluded that it must regulate pollutants at the time they enter ditches or streams with ordinary high-water marks— whether perennial, intermittent, or ephemeral — in order to properly control water pollution. 65 Fed. Reg. 12823 (2000). Because there is ambiguity in the phrase “waters of the United States” and because interpreting it broadly to cover such ditches and streams advances the purpose of the Act, the Corps’ approach should command our deference. Intermittent streams can carry pollutants just as perennial streams can, and their regulation may prove as important for flood control purposes. The inclusion of all identifiable tributaries that ultimately drain into large bodies of water within the mantle of federal protection is surely wise.
The plurality’s second statutory invention is as arbitrary as its first. Trivializing the significance of changing conditions in wetlands environments, the plurality imposes a separate requirement that “the wetland has a continuous surface connection” with its abutting waterway such that it is “difficult to determine where the ‘water’ ends and the ‘wetland’ begins.” Ante, at 742. An “intermittent, physically re *805 mote hydrologic connection” between the wetland and other waters is not enough. Ibid. Under this view, wetlands that border traditionally navigable waters or their tributaries and perform the essential function of soaking up overflow waters during hurricane season — thus reducing flooding downstream — can be filled in by developers with impunity, as long as the wetlands lack a surface connection with the adjacent waterway the rest of the year.
The plurality begins reasonably enough by recognizing that the Corps may appropriately regulate all wetlands “ ‘adjacent to’” other waters. Ibid. This recognition is wise, since the statutory text clearly accepts this standard. Title 33 U. S. C. § 1344(g)(1), added in 1977, includes “adjacent wetlands” in its description of “waters” and thus “expressly stated that the term ‘waters’ included adjacent wetlands.” Riverside Bayview, 474 U. S., at 138. While this may not “conclusively determine the construction to be placed on the use of the term ‘waters’ elsewhere in the Act..., in light of the fact that the various provisions of the Act should be read in pari materia, it does at least suggest strongly that the term ‘waters’ as used in the Act does not necessarily exclude ‘wetlands.’” Id., at 138, n. 11.
The plurality goes on, however, to define “ ‘adjacent to’ ” as meaning “with a continuous surface connection to” other water. Ante, at 742. It is unclear how the plurality reached this conclusion, though it plainly neglected to consult a dictionary. Even its preferred Webster’s Second defines the term as “[ljying near, close, or contiguous; neighboring; bordering on” and acknowledges that “[ojbjects are Adjacent when they lie close to each other, but not necessarily in actual contact.” Webster’s Second 32 (emphasis added); see also Webster’s Third 26. In any event, the proper question is not how the plurality would define “adjacent,” but whether the Corps’ definition is reasonable.
The Corps defines “adjacent” as “bordering, contiguous, or neighboring,” and specifies that “[wjetlands separated from *806 other waters of the United States by man-made dikes or barriers, natural river berms, beach dimes and the like are ‘adjacent wetlands.’” 33 CFR §328.3(c) (2005). This definition is plainly reasonable, both on its face and in terms of the purposes of the Act. While wetlands that are physically separated from other waters may perform less valuable functions, this is a matter for the Corps to evaluate in its permitting decisions. We made this clear in Riverside Bayview, 474 U. S., at 135, n. 9 — which did not impose the plurality’s new requirement despite an absence of evidence that the wetland at issue had the sort of continuous surface connection required by the plurality today. See supra, at 793; see also ante, at 772-774 (Kennedy, J., concurring in judgment) (observing that the plurality’s requirement is inconsistent with Riverside Bayview). And as the facts of No. 04-1384 demonstrate, wetland separated by a berm from adjacent tributaries may still prove important to downstream water quality. Moreover, Congress was on notice of the Corps’ definition of “adjacent” when it amended the Act in 1977 and added 33 U. S. C. § 1344(g)(1). See 42 Fed. Reg. 37129 (1977).
Finally, implicitly recognizing that its approach endangers the quality of waters which Congress sought to protect, the plurality suggests that the EPA can regulate pollutants before they actually enter the “waters of the United States.” Ante, at 742-746. I express no view on the merits of the plurality’s reasoning, which relies heavily on a respect for lower court judgments that is conspicuously lacking earlier in its opinion, ante, at 726-729.
I do fail to understand, however, why the plurality would not similarly apply this logic to dredged and fill material. The EPA’s authority over pollutants (other than dredged and fill materials) stems from the identical statutory language that gives rise to the Corps’ § 404 jurisdiction. The plurality claims that there is a practical difference, asserting that dredged and fill material “does not normally wash down *807 stream.” Ante, at 744. While more of this material will probably stay put than is true of soluble pollutants, the very existence of words like “alluvium” and “silt” in our language, see Webster’s Third 59, 2119, suggests that at least some fill makes its way downstream. See also, e. g., United States v. Deaton, 332 F. 3d 698, 707 (CA4 2003) (“Any pollutant or fill material that degrades water quality in a tributary . . . has the potential to move downstream and degrade the quality of the navigable waters themselves”). Moreover, such fill can harm the biological integrity of downstream waters even if it largely stays put upstream. The Act’s purpose of protecting fish, see 33 U. S. C. § 1251(a)(2); S. D. Warren Co., ante, at 385-386, could be seriously impaired by sediment in upstream waters where fish spawn, since excessive sediment can “smother bottom-dwelling invertebrates and impair fish spawning,” OTA 48. See also, e. g., Erman & Hawthorne, The Quantitative Importance of an Intermittent Stream in the Spawning of Rainbow Trout, 105 Transactions of the American Fisheries Society 675-681 (1976); Brief for American Rivers et al. as Amici Curiae 14 (observing that anadromous salmon often spawn in small, intermittent streams).
IV
While I generally agree with Parts I and II-A of Justice Kennedy’s opinion, I do not share his view that we should replace regulatory standards that have been in place for over 30 years with a judicially crafted rule distilled from the term “significant nexus” as used in SWANCC. To the extent that our passing use of this term has become a statutory requirement, it is categorically satisfied as to wetlands' adjacent to navigable waters or their tributaries. Riverside Bayview and SWANCC together make this clear. SWANCC’s only use of the term comes in the sentence: “It was the significant nexus between the wetlands and ‘navigable waters’ that informed our reading of the [Clean Water Act] in Riverside Bayview.” 531 U. S., at 167. Because Riverside Bayview *808 was written to encompass “wetlands adjacent to navigable waters and their tributaries,” 474 U. S., at 123, and reserved only the question of isolated waters, see id., at 131-132, n. 8; see also n. 3, supra, its determination of the Corps’ jurisdiction applies to the wetlands at issue in these cases.
Even setting aside the apparent applicability of Riverside Bayview, I think it clear that wetlands adjacent to tributaries of navigable waters generally have a “significant nexus” with the traditionally navigable waters downstream. Unlike the “nonnavigable, isolated, intrastate waters” in SWANCC, 531 U. S., at 171, these wetlands can obviously have a cumulative effect on downstream water flow by releasing waters at times of low flow or by keeping waters back at times of high flow. This logical connection alone gives the wetlands the “limited” connection to traditionally navigable waters that is all the statute requires, see id., at 172; 474 U. S., at 133 — and disproves Justice Kennedy’s claim that my approach gives no meaning to the word “‘navigable,’” ante, at 779 (opinion concurring in judgment). Similarly, these wetlands can preserve downstream water quality by trapping sediment, filtering toxic pollutants, protecting fish-spawning grounds, and so forth. While there may exist categories of wetlands adjacent to tributaries of traditionally navigable waters that, taken cumulatively, have no plausibly discernible relationship to any aspect of downstream water quality, I am skeptical. And even given Justice Kennedy’s “significant-nexus” test, in the absence of compelling evidence that many such categories do exist I see no reason to conclude that the Corps’ longstanding regulations are overbroad.
Justice Kennedy’s “significant-nexus” test will probably not do much to diminish the number of wetlands covered by the Act in the long run. Justice Kennedy himself recognizes that the records in both cases contain evidence that “should permit the establishment of a significant nexus,” *809 ante, at 788; see also ante, at 784, and it seems likely that evidence would support similar findings as to most (if not all) wetlands adjacent to tributaries of navigable waters. But Justice Kennedy’s approach will have the effect of creating additional work for all concerned parties. Developers wishing to fill wetlands adjacent to ephemeral or intermittent tributaries of traditionally navigable waters will have no certain way of knowing whether they need to get § 404 permits or not. And the Corps will have to make ease-by-case (or category-by-category) jurisdictional determinations, which will inevitably increase the time and resources spent processing permit applications. These problems are precisely the ones that Riverside Bayview’s deferential approach avoided. See 474 U. S., at 135, n. 9 (noting that it “is of little moment” if the Corps’ jurisdiction encompasses some wetlands “not significantly intertwined” with other waters of the United States). Unlike Justice Kennedy, I see no reason to change Riverside Bayview’s approach — and every reason to continue to defer to the Executive’s sensible, bright-line rule.
y
As I explained in SWANCC, Congress passed the Clean Water Act in response to widespread recognition — based on events like the 1969 burning of the Cuyahoga River in Cleveland — that our waters had become appallingly polluted. 531 U. S., at 174-175 (dissenting opinion). The Act has largely succeeded in restoring the quality of our Nation’s waters. Where the Cuyahoga River was once coated with industrial waste, “[tjoday, that location is lined with restaurants and pleasure boat slips.” EPA, A Benefits Assessment of the Water Pollution Control Programs Since 1972, p. 1-2 (Jan. 2000), http://www.epa.gov/ost/economics/assessment.pdf. By curtailing the Corps’ jurisdiction of more than 30 years, the plurality needlessly jeopardizes the quality of our waters. In doing so, the plurality disregards the deference it owes *810 the Executive, the congressional acquiescence in the Executive’s position that we recognized in Riverside Bayview, and its own obligation to interpret laws rather than to make them. While Justice Kennedy’s approach has far fewer faults, nonetheless it also fails to give proper deference to the agencies entrusted by Congress to implement the Clean Water Act.
I would affirm the judgments in both cases, and respectfully dissent from the decision of five Members of this Court to vacate and remand. I close, however, by noting an unusual feature of the Court’s judgments in these cases. It has been our practice in a case coming to us from a lower federal court to enter a judgment commanding that court to conduct any further proceedings pursuant to a specific mandate. That prior practice has, on occasion, made it necessary for Justices to join a judgment that did not conform to their own views.[13] In these cases, however, while both the plurality and Justice Kennedy agree that there must be a remand for further proceedings, their respective opinions define different tests to be applied on remand. Given that all four Justices who have joined this opinion would uphold the Corps’ jurisdiction in both of these cases — and in all other cases in which either the plurality’s or Justice Kennedy’s test is satisfied — on remand each of the judgments should be reinstated if either of those tests is met.[14]

 Pursuant to 33 U. S. C. §§ 1344(g)-(h), Michigan operates its own § 404 permitting program, subject to supervision from the Army Corps.

 Dr. Willard did not “stud[y] the upstream drainage of these sites . . . well enough to make a statement” about whether they also performed pollutant-trapping functions. 4 Tr. 96.

 By contrast, we “d[id] not express any opinion” on the Corps’ additional assertion of jurisdiction over “wetlands that are not adjacent to bodies of open water, see 33 CFR §§ 323.2(a)(2) and (3) (1985).” 474 U. S., at 131-132, n. 8; see also id., at 124, n. 2 (making the same reservation). Contrary to Justice Kennedy’s reading, ante, at 780 (opinion concurring in judgment), we were not reserving the issue of the Corps’ jurisdiction over wetlands adjacent to tributaries, but only reserving the issue of the Corps’ jurisdiction over truly isolated waters. A glance at the cited regulation makes this clear. Section 323.2(a)(2) refers to “[a]ll interstate waters including interstate wetlands” and § 323.2(a)(3) covers “[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters.” See also Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers, 531 U. S. 159, 163-164 (2001) (considering the validity of an application of § 328.3(a)(3) (1999), which is substantively identical to § 323.2(a)(3) (1985) and to § 323.2(a)(5) (1978)). Wetlands adjacent to tributaries of traditionally navigable waters were covered in the 1985 *793 regulation by other provisions of the regulation, namely, a combination of §§323.2(a)(1) (covering traditionally navigable waters), (4) (covering tributaries of subsection (a)(1) waters), and (7) (covering wetlands adjacent to subsection (a)(4) waters).

 As The Chief Justice observes, the Corps and the EPA initially considered revising their regulations in response to SWANCC. Ante, at 757-758 (concurring opinion). The Chief Justice neglects to mention, however, that almost all of the 43 States to submit comments opposed any significant narrowing of the Corps’ jurisdiction — as did roughly 99% of the 133,000 other comment submitters. See U. S. General Accounting Office, Report to the Chairman, Subcommittee on Energy Policy, Natural Resources and Regulating Affairs, Committee on Government Reform, House of Representatives, Waters and Wetlands: Corps of Engineers Needs to Evaluate Its District Office Practices in Determining Jurisdiction, GAO-04-297, pp. 14-15 (Feb. 2004), http://www.gao.gov/new.items/ d04297.pdf (hereinafter GAO Report) (all Internet materials as visited June 14,2006, and available in Clerk of Court’s case file); Brief for Association of State and Interstate Water Pollution Control Administrators as Amicus Curiae. In any event, the agencies’ decision to abandon their rulemaking is hardly responsible for the cases at hand. The proposed rulemaking focused on isolated waters, which are covered by 33 CFR § 328.3(a)(3) (1999) and which were called into question by SWANCC, rather than on wetlands adjacent to tributaries of navigable waters, which are covered by a combination of §§ 328.3(a)(1), (5), and (7) and which (until now) seemed obviously within the agencies’ jurisdiction in light of Riverside Bayview. See 68 Fed. Reg. 1994 (2003) (“The agencies seek comment on the use of the factors in 33 CFR 328.3(a)(3)(i) — (iii)... in determining *796 [Clean Water Act] jurisdiction over isolated, intrastate, non-navigable waters”).

 Unsurprisingly, most Courts of Appeals to consider the scope of the Corps’ jurisdiction after SWANCC have unhesitatingly concluded that this jurisdiction covers intermittent tributaries and wetlands adjacent — in the normal sense of the word — to traditionally navigable waters and their tributaries. E. g., United States v. Deaton, 332 F. 3d 698 (CA4 2003) (upholding the Corps’ jurisdiction over wetlands adjacent to a ditch that might not contain consistently flowing water but did drain into another ditch that drained into a creek that drained into a navigable waterway); Headwaters, Inc. v. Talent Irrigation Dist., 243 F. 3d 526 (CA9 2001) (treating as “waters of the United States” canals that held water intermittently and connected to other tributaries of navigable waters); United States v. Rueth Development Co., 335 F. 3d 598, 604 (CA7 2003) (observing “it is clear that SWANCC did not affect the law regarding... adjacency” in upholding the Corps’ jurisdiction over a wetland without finding that this wetland had a continuous surface connection to its adjacent tributary); Baccarat Fre *797 mont v. U. S. Army Corps of Engineers, 425 F. 3d 1150, 1156 (CA9 2005) (upholding the Corps’ jurisdiction over wetlands separated by berms from traditionally navigable channels and observing that “SWANCC simply did not address the issue of jurisdiction over adjacent wetlands”); but see In re Needham, 354 F. 3d 340 (CA5 2003) (reading “waters of the United States” narrowly as used in the Oil Pollution Act of 1990).

 Indeed, “[t]he Corps approves virtually all section 404 permitís],” though often requiring applicants to avoid or mitigate impacts to wetlands and other waters. GAO Report 8.

 According to the Sunding and Zilberman article cited by the plurality, ante, at 721, for 80% of permits the mean cost is about $29,000 (with a median cost of about $12,000). The Economics of Environmental Regulation by Licensing: An Assessment of Recent Changes to the Wetland Permitting Process, 42 Natural Resources J. 59, 63, 74 (2002) (hereinafter Sunding & Zilberman). Only for less than 20% of the permits — those for projects with the most significant impacts on wetlands — is the mean cost around $272,000 (and the median cost is $155,000). Ibid.
Of course, not every placement of fill or dredged material into the waters of the United States requires a §404 permit. Only when such fill comes from point sources — “discernible, confined and discrete eonveyance[s]” — is a § 404 permit needed. 33 U. S. C. §§ 1362(12), (14). Moreover, permits are not required for discharges from point sources engaged in, among other things, normal farming activities; maintenance of transportation structures; and construction of irrigation ditches, farm roads, forest roads, and temporary mining roads. § 1344(f).

 Rather than defending its own antagonism to environmentalism, the plurality counters by claiming that my dissent is “policy-laden.” Ante, at 746. The policy considerations that have influenced my thinking are Congress’ rather than my own. In considering whether the Corps’ interpretation of its jurisdiction is reasonable, I am admittedly taking into ac *799 count the congressional purpose of protecting the physical, chemical, and biological integrity of our waters. See 33 U. S. C. § 1251(a); see also Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 863 (1984) (considering whether the agency regulation was consistent with “the policy concerns that motivated the [Clean Air Act’s] enactment”).

 Only 3 of the 21 amici briefs filed on petitioners’ behalf come even close to asking for one of the plurality’s two conditions. These briefs half-argue that intermittent streams should fall outside the Corps’ jurisdiction — though not for the reasons given by the plurality. See Brief for National Stone, Sand and Gravel Assn. et al. 20, n. 7; Brief for Foundation for Environmental and Economic Progress et al. 22-23; Brief for Western Coalition of Arid States 10.

 The plurality does suggest that “seasonal rivers” are not “necessarily exclude[d]” from the Corps’ jurisdiction — and then further suggests that “streams” are “rivers.” Ante, at 732, n. 5. I will not explore the semantic issues posed by the latter point. On the former point, I have difficulty understanding how a “seasonal” river could meet the plurality’s test of having water present “relatively permanent[ly].” By failing to explain *801 itself, the plurality leaves litigants without guidance as to where the line it draws between “relatively permanent” and “intermittent” lies.

 Indeed, in the 1977 debate over whether to restrict the scope of the Corps’ regulatory power, Senator Bentsen recognized that the Corps’ jurisdiction “cover[s] all waters of the United States, including small streams, ponds, isolated marshes, and intermittently flowing gullies.” 4 Legislative History of the Clean Water Act of 1977 (Committee Print compiled for the Senate Committee on Environment and Public Works by the Library of Congress), Ser. No. 95-14, p. 903 (1978). His proposed amendment to restrict this jurisdiction failed. Id., at 947.

 The plurality’s reasoning to the contrary is mystifying. The plurality emphasizes that a ditch around a castle is also called a “moat” and that a navigable manmade channel is called a “canal.” See ante, at 736, n. 7. On their face (and even after much head scratching), these points have nothing to do with whether we use the word “stream” rather than “ditch” where permanently present water is concerned. Indeed, under the plurality’s reasoning, we would call a “canal” a “stream” or a “river” rather than a “canal.”
Moreover, we do use words like “ditch” without regard to whether water is present relatively permanently. In Jennison v. Kirk, 98 U. S. 453 (1879), for example, Justice Field used the term “ditch” — not “stream” — in describing a manmade structure that carried water year round. See also, e. g., Knoxville Water Co. v. Knoxville, 200 U. S. 22, 27 (1906) (opinion for the Court by Harlan, J.) (describing “pipes” that would continuously carry water); ante, at 739, 742 (plurality opinion) (using “channel” with reference to both intermittent and relatively permanent waters); PUD No. 1 of Jefferson Cty. v. Washington Dept. of Ecology, 511 U. S. 700, 709 (1994) (describing a “tunnel” that would carry water year round); New Orleans Water-Works Co. v. Rivers, 115 U. S. 674, 683 (1885) (opinion for the Court by Harlan, J.) (describing “conduits” that would supply water for a hotel). The plurality’s attempt to achieve its desired outcome by redefining terms does no credit to lexicography — let alone to justice.

 See, e. g., Screws v. United States, 325 U. S. 91, 131-134 (1945) (Rutledge, J., concurring in result); Turner Broadcasting System, Inc. v. FCC, 512 U. S. 622, 674 (1994) (Stevens, J., concurring in part and concurring in judgment); Hamdi v. Rumsfeld, 542 U. S. 507, 553-554 (2004) (Souter, J., concurring in part, dissenting in part, and concurring in judgment).

I assume that Justice Kennedy’s approach will be controlling in most cases because it treats more of the Nation’s waters as within the Corps’ jurisdiction, but in the unlikely event that the plurality’s test is met but Justice Kennedy’s is not, courts should also uphold the Corps’ jurisdiction. In sum, in these and future cases the United States may elect to prove jurisdiction under either test.